## UNITED STATES v. HARE
(three cases).

Nos. 8873–8875.

Circuit Court of Appeals, Seventh Circuit.

Feb. 8, 1946.

Rehearing Denied Feb. 25, 1946.

Writ of Certiorari Denied April 29, 1946.

See 66 S.Ct. 983.

Herman W. Kothe and Silas C. Kivett, both of Indianapolis, Ind., Daniel S. Ring, of Washington, D. C., and Kothe & Shotwell and Kivett, Chambers, Vernon & Kivett, all of Indianapolis, Ind. (Grier M. Shot-

well, of Indianapolis, Ind., of counsel), for appellants.

B. Howard Caughran, U. S. Atty., and Paul A. Ffister, Asst. U. S. Atty., both of Indianapolis, Ind., for appellee.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

This appeal reviews a sentence on conviction under the Emergency Price Control Act. 50 U.S.C.A.Appendix, §§ 901–946. Appellants are officers of J. C. Perry Company, and along with said company and a salesman named Rozelle, were charged in one indictment containing six counts, with the sale of liquor at wholesale in excess of ceiling prices in five counts, and in the sixth count, they were charged with conspiracy. Rozelle pleaded guilty; the Perry Company was found not guilty, and the appellants were, by a jury, found guilty on all six counts. The court imposed sentences as follows: Robert Hare, a total of three years and $25,000 fine; Clinton Hare, one year and a day, and $25,000; John Hare, two years and $25,000.[1]

The evidence came from a salesman, Rozelle, from one Clark, from the purchasers of liquor, and from the appellants. Large quantities of whiskey were sold at prices in excess of the duly established ceiling price, the excess being usually paid in cash at the time of the negotiation of the sale, and the ceiling price being paid at the time of the delivery of the merchandise, or within the period of extended credit. In other words, payment of the ceiling price was by check; excesses were generally paid in cash. Rozelle, the salesman, when on sales trips, often took a friend, one D. Jones, along, and represented to the customers that the liquor belonged to Jones. The premium (excess over ceiling price) was paid to Jones, who later turned it over to Rozelle. Jones had no interest in the whiskey or in the transaction.

The appellants, Robert, Clinton, and John Hare, were respectively, secretary, treasurer, and president of the Perry Company. This Company was also engaged in the wholesale grocery business with its offices at Indianapolis.

Appellants' version of the facts is that Perry Company found itself possessed of several hundred barrels of whiskey which it had purchased for a dollar a gallon more than the ceiling price, which was thereafter placed on it by the Government. They first decided to take a loss in order to liquidate the stock and "get out." Rozelle told Robert Hare, who was the chief movant among the brothers, that he could find purchasers for the liquor, and was told to go ahead. In Ohio, a man named Clark was a liquor purchaser for a pool of tavern keepers who were very desirous of obtaining liquor. The word "desirous" inadequately describes the mental state of the tavern keepers, for the evidence showed the Ohio tavern keepers were willing to pay, and did pay, approximately $342,000 for whiskey which had a ceiling price value of $96,000. He and Rozelle negotiated the price, and Clark collected funds to pay in advance the over-ceiling amount, which it was appellants' understanding was a "finder's fee," i.e., paid by the buyers to the agent who was able to buy liquor for them. On one occasion Clark brought $92,000 in cash to Rozelle's home, but Mrs. Rozelle demurred to keeping that much money in her home over night. Rozelle then phoned Robert to come and get it, but he wasn't home, so he phoned John Hare, who came and took it away, without knowing, so he said, what he was taking as the money was wrapped in paper.

The total sums received from the sales to, or through, Clark in Ohio, in excess of the ceiling price and expenses, totaled $168,000, which sum was divided between the appellants and Rozelle. The three brothers were under the impression, so they said, that they were receiving a distributive share of the finder's fee paid by Clark to Rozelle. Each received approximately $42,000, subject to a deduction of the amount which he had previously borrowed against this fund.

John testified that he inquired of his brother Robert and of Rozelle whether a

---

[1] All received a one year sentence and $3,000 fine on each of the first five counts, the fines being cumulative and the sentences being concurrent. Robert received two years on the conspiracy count, which was to be served consecutively with the other one year sentence; Clinton received one year and a day on the conspiracy count, to be served concurrently with the other sentences. John received two years on the conspiracy count to be served concurrently with the other sentences. Each received a $10,000 fine on the conspiracy count.

finder's fee was a legal transaction and was assured it was.

The Perry Company's books reflect simply the receipt of the ceiling price of the liquor sold. None of the other stockholders (members of the Hare family) received any of these funds. All the liquor sold was evidently the Company's property.

The Government, on the other hand, produced evidence to the effect that Clark was an agent of the Perry Company, as disclosed by a letter written by Perry Co., delivered in September, but dated in May of 1943, wherein it was stated that he was a salesman of the Perry Co. As such salesman he could not be the payor of a "finder's fee" to his principal.

Robert Hare and Rozelle conferred with Clark at Dayton, Ohio, about three times, in reference to the sale of liquor. Sales to Clark by Perry Co. totalled $342,944.16 for which the ceiling price was $96,680.57.

As to the sales in Indiana, which were covered by the first five counts of the indictment, the sales price was $58,224.74, which was $20,944.27 in excess of the ceiling price.

Appellants challenge the existence of any evidence to connect them with the Indiana sales. To answer this challenge, the Government points to the testimony of the agent, Rozelle. He testified that "The over-ceiling portion of the money collected on the Indiana sales was taken down to the J. C. Perry & Company * * *," where "Mr. Hare told him to handle it, and he, the witness, put it in envelopes and handed it to the cashier to put in the vault; and when I got ready I would cut it up or pay off. * * * the profit that was made from it we cut up and divided equally among the three Hares and myself."

The appellants denied the receipt of this money and of any connection with the Indiana transactions.

■ Although the evidence made guilty participation in the Indiana transactions a jury question, we might add, that we would be more prone to accept appellants' argument if the Indiana transactions were isolated transactions. When viewed in the setting of the other and larger transactions, however, it loses much of its probative weight. There were also the so-called Kentucky transactions wherein Rozelle sold liquor having a ceiling price of $5,950, receiving therefor $30,000, which

was divided between him and the appellants.

We have read the entire record. It discloses flagrant violations of the Maximum Price Regulations. Whether the initiator of the enterprise was Rozelle, or his employers, is unimportant. Robert Hare was an active supervisor of Rozelle in these transactions. In fact, the jury could have found he was an active participant in this, the major and very profitable part of the business of the J. C. Perry & Company.

The other brothers' connection does not appear as clearly, as Robert's, except that each accepted at least $42,000 as his distributive share of the enterprise. The jury might well have concluded the acceptance of this large sum as a share of a supposed finder's fee was nothing but an alibi grasped in desperation by appellants who found it as hard to explain the division of this allegedly legally made money as it was to conceal its existence. As a significant disturbing fact in the case, it assumes the importance of a fire alarm preceding a fire. Explanations of it only provoke questions, and questions provoke adverse conclusions.

■ As a matter of law, appellants contend there can be no conviction because the Perry Company, which owned the whiskey, was found not guilty of having sold it at more than ceiling price. They, as individuals, so they argue, could have formed no unlawful agreement to sell the whiskey they did not own, without the owner's consent.

This is an ingenious argument which gains plausibility solely because of the legal fiction of corporate entity. Being such corporate entity, it could act only through its agents, in this case, the appellants who had complete control of its activities, and who used the corporation as an instrumentality to negotiate the illegal venture. Since the corporation received no share of the over-ceiling price, was able to distribute none of the profits to its shareholders, received no authorization from its stockholders to carry on such an enterprise—said stockholders being entirely ignorant of the activities—the basis for the not guilty verdict as to the corporation is not hard to understand.

There is additional fallacy in this argument that, not being owners of the liquor and the real owner of the liquor having been found not guilty, appellants are

relieved of criminal responsibility. It is not alone the criminal *sellers* who are liable. The Act, Chap. 26, Sec. 4, provides: "It shall be unlawful * * * for any person to sell *or deliver* * * * any commodity * * * in violation of any regulation * * *." The maximum price regulation No. 445 provides, Art. VII, Sec. 7.8, "* * * no person * * * shall sell or *supply* * * * any distilled spirits * * * at prices higher than the maximum price * * *." Again, "The Maximum prices * * * shall not be evaded by direct or indirect methods, whether by finder's fee, * * *".

This phraseology is broad enough, and the purpose of the Act obviously comprehensive enough to embrace the active agent of a silent and otherwise impotent owner. See United States v. Weiss, 2 Cir., 150 F.2d 17, 19.[2]

As incidental to their argument for acquittal because not the owners of the liquor sold, appellants argue for reversal on the ground that no conspiracy was proved. They say a conspiracy different from that alleged was proved, that the principal in the conspiracy having been found innocent, the others charged must be discharged. This argument is also based on the assumption that the corporation was an individual which was the owner and therefore the prime mover in the criminal act, and since it was found not guilty, its accessories must ipso facto be declared not guilty.

 In the first place, inconsistent verdicts are not fatal. Dunn v. United States, 284 U. S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; United States v. General Motors, 7 Cir., 121 F.2d 376; Chiaravalloti v. United States, 7 Cir., 60 F.2d 192; Carrigan v. United States, 7 Cir., 290 F. 189; Nadl v. United States, 7 Cir., 6 F. 2d 574. The fact that a jury finds one party not guilty does not militate against a verdict of guilty as to a codefendant. The determinative query is over the sufficiency of the evidence to support the verdict of guilt as to the codefendants who are appealing. We look to the evidence to determine the guilt of an accused person, not to the verdict as to guilt of another defendant.

As pointed out above, however, there is no inconsistency in the instant verdict. The corporate entity sold liquor at ceiling prices, but appellants by means of an exorbitant premium collected independently of the ceiling price but in the negotiation of that ceiling price sale, turned the legitimate sale into an illegal one, without benefit to the corporation, or awareness on the part of its other stockholders or employees. The corporation was not the "principal" in the crime, it was the medium manipulated by appellants to the end desired.

The judgments are affirmed.

---

[2] "If the promisor in fact has command over the goods at the time of performance, so that he can procure the transfer of title from the owner to the buyer, it is of no importance that it does not pass through him."