**UNION STOCK FARMS et al.,**
**Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**Nathan MILLER et al., Respondents.**

**No. 15733.**

United States Court of Appeals
Ninth Circuit.

March 9, 1959.

J. E. Simpson; Horowitz & Howard, Fred Horowitz, Alvin F. Howard, Los Angeles, Cal., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Grant W. Wiprud, Lee A. Jackson, Meyer Rothwacks, Attorneys, Department of Justice, Washington, D. C., for respondent.

Before BARNES, HAMLIN and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

This is a petition for review of ten Tax Court decisions, consolidated for hearing by order of this Court. There were twenty-three separate proceedings below which were consolidated and heard as one. Only these ten—six by the taxpayers and four by the government—are appealed. The government's appeal is a protective one, asking an alternative treatment of certain sums of money if the taxpayers succeed on the points they raise. All jurisdictional requisites appearing to have been complied with, this Court has jurisdiction by virtue of §§ 7482–7483 of Int.Rev.Code of 1954, 26 U.S.C. §§ 7482–7483.

Originally the Commissioner determined, in each of these cases, deficiencies *and* fraud penalties against the taxpayers. The Tax Court substantially agreed with the Commissioner on the deficiencies, but held that since there was some question, and considerable conflict of the evidence, the fraud penalties were improper. Neither party questions this latter holding.

We adopt, as more accurate and less argumentative, the statement of facts summarized in the Government's Brief, omitting certain facts concerning matters from which no appeal is taken, and adding some clarifying language:

## "General Facts

"In 1922 the deceased taxpayer Adolph Miller [the key figure], August Vogel and Joe Born incorporated the taxpayer Union Packing Company (sometimes referred to herein as Packing), each having an equal interest. In 1928 Adolph and one Glen Shivel bought out the others. Thereafter Adolph held a 57 per cent interest, and Shivel the remaining 43 per cent. On Shivel's death in 1940 his widow, Hazel, received his interest and held it until September, 1947, when she sold it to Nathan, Benjamin and Robert Miller. Nathan (also called Nate) and Benjamin (also called Ben) are sons of Adolph and his wife, Pauline, and are married respectively to Leona Miller and Sylvia Miller. Robert is a nephew of Adolph, cared for by Adolph and Pauline from an early age.

"Taxpayer Union Stock Farms (sometimes referred to herein as Stock Farms) was a wholly-owned subsidiary of Packing at all times in question, engaged in the feeding of cattle and growing of feed on land near Blythe, California. Adolph was president of Packing and Stock Farms at all times in question, and also of Union Feed Yards, Inc. [sometimes referred to herein as Feed Yards], another wholly-owned subsidiary of Packing. No formal dividends were declared by these three corporations during the years 1942 through 1947, and no stockholders' or directors' meetings were held.

"During the years 1942 through 1947 Adolph had general supervision of the business of Packing and Stock Farms. Nathan Miller was employed by Packing as a cattle buyer during 1942, 1943, 1944 and until September 1, 1945. Ben Miller was employed by Packing as assistant superintendent and purchasing agent from 1940 until May, 1943, and as sales manager from January, 1945. Hazel Shivel took no active part in the operations or management and was not consulted as to corporate matters.

"Ray Latimer entered the employ of Packing in 1935 or 1936, and served as sales manager from 1940 until he left the company at the end of 1944. George Ep-

stein was secretary-treasurer of Packing and in charge of the office and credits. Neil Leising was a Packing salesman, working under Latimer in 1943 and 1944 and under Ben Miller thereafter. John Hachten was Packing's plant superintendent from February 1, 1943, until February, 1948.

"Adolph was one of the three West Coast men appointed on a beef advisory committee for the Office of Price Administration (O.P.A.), and attended meetings of that committee in Washington, D. C.

"Packing's income tax returns for 1943–1945 showed gross sales ranging from over $6,000,000 in 1943 to nearly $8,000,000 in 1945, gross profits ranging from nearly $300,000 in 1943, to over $325,000 in 1944, to over $265,000 in 1945, and net income ranging from over $51,000 in 1943 to over $63,000 in 1945.

### "Overceiling Collections

"During 1943, 1944 and until the fall of 1945, O.P.A. price ceilings were in effect upon meat. Packers were required to set aside quotas of meat for the Army or Navy. Subsidies were paid by the Government to processors, who were required to certify that their prices conformed to ceiling prices. Taxpayer Union Packing Company set aside meat quotas for Government use and claimed subsidies for meat processed. Packing received subsidies in the period June, 1943, to April, 1946, amounting to $2,448,491.23.

"Beginning in late 1942 there was a substantial meat shortage in the Los Angeles area and Packing was unable to supply all the demands of its customers. Beginning about April, 1943, overceiling prices for meat were charged to and collected from its customers. Packing billed the customers at ceiling prices and received payment for such billings usually by check. The overceiling payments were made weekly by the customers in currency placed in envelopes and handed usually to Latimer or Nate Miller. Nate took charge of the money collected. The envelopes were opened and the money counted each week in Packing offices. From the proceeds Nate distributed $100 each to Latimer, Epstein, Ben and himself, made some other payments to Latimer and divided the remainder between Ben and himself. No part of this money was recorded on Packing's books. Collections were made from about 90 per cent of the civilian customers. At first the overcharge was 10 per cent of the invoiced ceiling prices. Later the overcharge was based upon pounds of meat delivered, beginning at a rate of two to four cents per pound and increasing later, in 1945, to five cents per pound and in some cases six to eight cents. The larger chain stores did not pay overceiling but smaller chains and retail markets did. In some instances customers refused to pay and found their supply stopped.

"The Tax Court found as an ultimate fact that Adolph Miller authorized the collection of overceiling payments on meat sold by Packing.

"Collection of the overceiling amounts continued until about April 1, 1945. At that time Nate and Ben entered into purported partnership agreements with certain customers operating retail meat markets, under which Nate and Ben would share in their profits. These agreements were in effect from April to October, 1945, when price controls came to an end. A typical agreement, with one Sam Wilkins, provides for a 'partnership' between Wilkins and Nate and Ben, to operate a retail market under Wilkins' name; Wilkins to invest in the 'partnership' merchandise at an agreed valuation of $700, and the Millers to invest the sum of $700; Wilkins to receive a weekly salary of $100, and each of the Millers $25; the net profits to be divided 50 per cent to Wilkins and 50 per cent to the Millers; Wilkins to devote his entire time to the operation of the business, and the Millers to 'supervise' the business and 'establish the policies of said business.' The agreement could be terminated at the end of any month by one week's notice from Wilkins or the Millers, and in that event each party was to receive 'his interest in

the partnership assets and profits' in a specified manner. Finally, Wilkins agreed to indemnify the Millers against loss or liability by reason of violations of law by the partnership business and/or Wilkins.

"There were 16 such agreements made, effective between April 9 and June 3, 1945, and terminated between July 30 and October 31. Nate and Ben invested from $250 to over $1,800 in each market, based upon a percentage of the inventory, and received from 30 to 90 per cent of the profits. One other market was rented from the owner at $250 per month and Nate and Ben took the entire profit of $7,841.97.

"The Tax Court found as an ultimate fact that the purpose of these retail market 'partnership' agreements was to effect further collections of overceiling prices on meat sold by Packing, without any intention on the part of Nate and Ben to join with the other parties in the conduct of the markets for any other purpose.

"Nathan and Ben and their wives filed returns for 1943–1945 on a community property basis. They did not include in their original returns the overceiling payments, except for the amounts received from their retail market contracts. However, in amended returns for 1943–1945 filed in 1948, they included amounts aggregating $62,000 for 1943, $19,600 for 1944 and $28,800 for 1945 of additional income, and paid the additional taxes and accrued interest thereon. Thereafter, Nathan and Ben were indicted for filing fraudulent income tax returns for the years 1944 and 1945. They pleaded *nolo contendere* and were fined on each of two counts. Neither the corporation nor Adolph were indicted for tax evasion.

"The Tax Court found as ultimate facts that the overceiling collections amounted to $167,000 in 1943, $65,000 in 1944 and $30,000 in the first three months of 1945; and that during the period April to October, 1945, Nate and Ben received $80,779.68 from their retail market agreements. * * *

## "Cattle Dealings

"Nate Miller was employed by Packing as a cattle buyer during 1942, 1943, 1944 and until September 1, 1945. He received a salary of $7,700 in 1942, $7,780 for 1943 and for 1944, and $4,760 for 1945 prior to September. Occasionally Packing had a surplus of cattle at the plant and sold them to other processors or to cattle dealers. In December, 1942, Nate arranged for the sale of cattle which had cost Packing $13,666.76 (exclusive of feeding and handling costs) for $15,032.60. The purchaser paid $13,192.85 to Packing and $1,839.75 to Nate. Nate remitted $473.91 to Packing to cover the balance of its cost and retained the profit of $1,365.84. This amount was reported as income on a partnership return filed by Nate and Ben, doing business as Miller and Miller, and divided equally between them.

"The return of this partnership for 1943 reported sales of $92,575.91, cost of goods sold of $78,722.88, and profits of $13,853.03. These profits were derived from seven sales by Nate, through commission houses, of cattle held by Packing. Nate divided the profits with Ben and other persons, including George Epstein.

"Nate had authority to approve vouchers for payment by Packing and in some transactions he was both seller and agent for the buyer. In 1944 he handled about 25 transactions involving purchases and sales of cattle, giving Ben a share of the profits. In a typical transaction Packing purchased 615 steers in June, 1944. Of these 465 were used in production and 150 were sold to other packers for $22,243.75. Packing recorded its costs at $71,456.23 which amount it paid to Nate in installments, but omitted to show on its books the proceeds of the sale, which Nate collected and retained. Nate paid the original vendors $83,202.63 and retained a profit of $10,497.35. Part of this profit in the amount of $5,089.08 was paid to John Hachten. There were similar transactions in which profits were retained by Nate. The partnership return for 1944, filed under the name of

Nathan Miller, et al., reported sales of $438,087.15, costs of $388,273.53 and a net income for distribution of $48,922.-15. Partners' shares were shown as Nate Miller $17,011.26, Ben Miller $7,625.40, Hachten $5,089.07, and Latimer $19,-196.84.

"Latimer had paid Nate $5,000 in July, 1944, as an investment in the partnership, and was repaid the amount in December, 1944. He performed no services, and was shown on the partnership return as receiving a share of the profits in order to enable him to show on his income tax return an amount of income equal to the overceiling collections he received.

"In 1945 profits from cattle transactions similar to those described above totaled $37,986.64. Nate retained these profits and they were reported as his income for 1945. In all such transactions prior to September, 1945, sales by Packing were run through Nate's records as a purchase by Nate from Packing and a resale by him. Purchases made for Packing were run through Nate's records as a purchase by him from the vendor and a resale by him to Packing. In sales Nate usually received funds from the buyer before he paid Packing and on purchases he usually received payment from Packing before he paid the vendor.

"About September 1, 1945, Nate left the employ of Packing and formed a partnership with Charles Whitlock, previously a buyer for another packing company, under the name of Alkali Cattle Company, doing business as buyers and sellers of cattle. In 1948 Nate sold out his interest in the partnership to Whitlock who continued to operate the business.

"*Union Stock Farms*

"Prior to 1944 Stock Farms acquired about 2,000 acres of farming land in the Palo Verde Irrigation District near Blythe, built a feed mill and yard on the property for the feeding of cattle, and used the remaining acreage for raising alfalfa and grain. This land, with the exception of not more than 100 acres, had been leveled, irrigated and farmed prior to its purchase by Stock Farms. It is essential for proper gravity irrigation and proper farming to have the land leveled or graded both as to fall and as to side fall, and dirt borders must be built before the crop is planted so that the irrigation water may be controlled within a certain area. If the fall of the land is too steep the water will flow too rapidly and wash and tear the soil. All of the crops grown by Stock Farms were annual except alfalfa. * * * After the removal of each crop, good farming practice in this district requires releveling and touching up on the fields, so that the water will flow over the entire area and not stand in depressions or ponds. During the years 1944–1947 Stock Farms spent sums for permanent improvements or restoration of flooded lands and other amounts for expenses of a recurring nature in preparing land for growing current crops.

"The Tax Court found as an ultimate fact that the amounts expended by Stock Farms for repairs of an annually recurring nature were $30,000 in 1944, $40,-000 in 1945, $20,000 in 1946, and $2,785.-17 in 1947.

"Stock Farms paid $3,525 to Robert Miller as salary for 1944. He performed no services for Stock Farms in 1944, being in military service from the fall of 1943 until March, 1946. He was not an employee of Stock Farms at the time he was drafted. He had worked for Stock Farms for about six months in 1940 and 1941.

"In 1945 Stock Farms purchased over 100 carloads of damaged Australian wheat for use as feed or fertilizer. Adolph arranged a sale of five or six carloads of this and kept the profit of $3,-628.80, which was included as income in the returns of Adolph and Pauline for 1945. Most of the wheat was used in Stock Farms' feed yard. A quantity was sold to a brokerage firm, and some of this was sold under an arrangement to put a profit in the hands of Adolph's nephew, Meyer Schorr, in 1946. Schorr did not have the capital to buy the wheat and after an offer to buy was received by Stock Farms from brokers the wheat was

transferred to Schorr for resale to the brokerage firm. Schorr gave Stock Farms his check for $58,170.97 and retained the realized profit of $12,094.26.

*"Union Packing Company Adjustments*

"In each of the years 1942 through 1946 Packing paid amounts to Hazel Shivel shown on the books as salaries. These payments were made in fulfillment of an agreement made between Adolph and Glen Shivel that upon the death of either, the survivor would cause the corporation to pay the widow of the other an amount equal to one-half the salary of the survivor. The amounts paid her were $8,185 in 1942 and $8,320 in each of the years 1943, 1944, 1945 and 1946. Hazel performed no services for Packing. After the sale of her stock in September, 1947, these payments terminated.

"In its 1944 return Packing claimed a net loss on the sale of land in the amount of $9,205.92, which was disallowed by the Commissioner. The corporation's books showed cost of the land, acquired in 1931, as $18,151.02, the selling price as $9,013.50, and cost of sale as $68.40."

For purposes of convenience, we will generally refer to Union Stock Farms, et al., as petitioners, and to the Commissioner of Internal Revenue as respondent.

■ Petitioners raise ten specifications of error. All but one, referring to an attempt to impeach the respondent's witness Latimer, are mixed questions of law and fact, and largely of fact. We are, of course, as appellants concede, required to adopt on appeal the interpretation of evidence most strongly favoring the respondent's position, and to determine if the Tax Court's conclusion was clearly erroneous. Fed.R.Civ.P. 52(a), 28 U.S.C.

With this standard in mind, we consider each of the errors urged by petitioners. We find the following issues presented, paraphrasing to some extent petitioners' language:

*Issue No. 1.*

■ Were the overceiling black market moneys collected by employees of Packing and retained by them, with either the express or implied consent of Adolph Miller, taxable first to Packing and then to Adolph and his wife Pauline (under community property law) as constructive dividends? If this question is answered affirmatively, were the amounts found as overceiling payments properly determined by the Tax Court?

There is ample evidentiary support for the Tax Court's conclusion that black market overceiling payments were made by 90% of Packing's customers to employees of Packing. They were made in cash, collected by Nate and Latimer, and the cash divided by Nate. One hundred dollars per week went to Latimer, Epstein, Ben and Nate. Such receipts were not shown on the books of Packing, nor reported by Packing or its stockholders as income. But the meat sold was owned by Packing. Adolph Miller and his sons denied knowledge of such overceiling payments, but their testimony was contradicted by the testimony of six other witnesses.

Adolph Miller originally owned one-third of the capital stock of Packing, and after 1928, he owned fifty-seven per cent. Forty-three per cent was owned by Glen Shivel until 1940, and upon his death and until 1947, his widow Hazel Shivel owned the minority stock. This litigation has to do with deficiencies for the years 1942 to 1948, inclusive. Adolph Miller was in complete and absolute control of Packing, and all its subsidiaries, during the period under consideration. Hazel Shivel, the sole minority stockholder, had no voice in its control, and was not consulted. Nate and Ben were employees *only*, during the period in question, and until 1947. There were no stockholders' meetings, and no directors' meetings. No dividends were paid by any of these three corporations from 1942 through 1947.

Adolph had general supervision and control of the business of Packing and its subsidiary, Stock Farms. He was president of Packing, of Stock Farms, and of Feed Yards.

By his own testimony, he was the general manager of the operations.[1] If the corporation acted at all, it was under, by, and through Adolph Miller.

Petitioners first urge that the findings are fatally defective here because there was no finding and no proof that Packing, "as a corporate act, authorized any employee to receive or misappropriate money." It would indeed be strange if any corporation ever purported to grant authority, as a corporate act, for an employee to misappropriate its money. The court did find that "Adolph Miller *authorized* the collection of overceiling payments on meat sold by Packing." These collections were made each week during a period of about two years. The money was counted and divided in the offices of the Packing plant. A number of customers protested the charges to Adolph. In some instances, customers refused to pay and found their supply of meat stopped. While it is true that Adolph denied knowledge of such overpayments, the trier of fact believed that Adolph had *sanctioned*, if he did not originate and direct, the overceiling collections—and he found as a fact that Adolph had *authorized* such transactions. There is ample evidence to support such a finding.

We mention three matters: (1) Petitioners urge that the corporation not only never received the payments, but never had the use or benefit of the money. We find a corporation closely supervised by one man doing a business of six to eight million dollars per year, with several hundred thousand dollars of profits each year, *not* paying any dividends. The salaries it paid were not high. But the moneys it permitted its employees and stockholders and their relatives to obtain in unusual ways were substantial. How better to convert the money received by the illegal operations to the use and benefit of the corporation?

We believe that the Tax Court was entirely correct in rejecting Harry Sherin, 1949, 13 T.C. 221, as inapposite on its facts,[2] and relying on United Dressed Beef Co., 1955, 23 T.C. 879.

(2) Petitioners urge that "Packing never had control over the illegal commissions." Under the facts herein developed, the only person who acted for the corporation at any time was Adolph. If he knew of the illegal payments, as the court found he did, then he had the same control over them, on behalf of the corporation, as any other corporate officer, who, with knowledge of the stealing or diversion of corporate funds, does nothing to stop the theft.

(3) Petitioners urge that Mrs. Shivel, as a substantial stockholder, and innocent of any wrong, must bear the tax on forty-three per cent of the illegal collections, and that is unfair to her. This overlooks the moneys she received as salary for doing nothing (see Issue No. 8, infra) and, more importantly, the fact that she sold her forty-three per cent interest in the corporation for $400,000 in 1947. While she still holds the stock for security on the last eight annual pay-

---

1. Testimony of Adolph Miller:

"Q. Who have been the officers of the Union Feed Yards, Inc., since Mr. Shivel died, and the Union Stock Farms? A. There hasn't been any changes made in either one of those corporations.

"Q. In other words, you are the sole officer of all three corporations, the sole active officer? A. I think so.

\* \* \* \* \*

"Q. Are you in charge of all three corporations and whatever decisions you made were the decisions then of the corporations, is that correct? A. Pretty much.

"Q. Is that true of all three corporations? A. That is right.

"Q. By that I mean the Union Packing Company, the Union Feed Yards, and the Union Stock Farms. A. That is right.

"Q. Did Mrs. Shivel have any voice in any of the corporate decisions? A. Well, she didn't care too much about discussing any operation of any one of those companies.

"Q. Then your answer is she didn't? A. She didn't."
[Tr. pp. 700-701.]

2. As a striking example, Sherin, owner of a fifty per cent interest in the corporation first *had no knowledge* of the illegal payments, and on learning the facts *repudiated* his co-stockholders' actions.

ments, there is in the record no evidence her sale was conditional, or could now be upset. Further, she was the recipient, without investment of a penny or the performance of any services, of a forty-three per cent interest in a cannery partnership operation from which she received many thousands of dollars annually before she sold her Packing stock.

Petitioners urge that United States v. Hare, 7 Cir., 1946, 153 F.2d 816, 819, clearly supports their contention that the illegal actions of a corporation's employees must be considered separately and not be deemed those of the corporation's acts. But there the stockholders were entirely ignorant of the illegal activities. The court comments on the lack of "awareness on the part of its other stockholders or employees" that certain officers had turned a legitimate liquor sale into an illegitimate one.

We point out further that the persons who paid the illegal overceiling prices were ninety per cent of the regular customers of Packing, and that the employees receiving the money performed no unusual or additional services for the customers, and that all the meat so sold was owned by Packing. Estate of Esther M. Stein, 1956, 25 T.C. 940, 953; Miller-Smith Hosiery Mills, 1954, 22 T.C. 581.

That the money did not actually pass into the corporate treasury and thence out to the employees is not decisive. Simon v. Com'r, 8 Cir., 1957, 248 F.2d 869; Drybrough v. Com'r, 6 Cir., 1956, 238 F.2d 735; Dawkins v. Com'r, 8 Cir., 1956, 238 F.2d 174; Currier v. United States, 1 Cir., 1948, 166 F.2d 346.

■ In conclusion on Issue No. 1, we agree with petitioners that command over income is a primary test of taxability; and that the corporation must have authorized the illegal transaction resulting in the income. Both facts here exist. We cannot agree that when an individual who is a majority stockholder, the guiding spirit and the sole officer actively in charge, authorizes the illegal acts, he does it only as an individual and not in his corporate capacity.

Here, in truth, if not in law, Adolph *was* the corporation; an "essentially individual ownership business [was] being run in a corporate form." [3]

We next consider the accuracy of the determination of the amounts found by the court to be involved.

■ Here we are faced with a familiar set of facts. The taxpayers, knowing they were violating the law in accepting black market overceiling payments, kept no accurate records, and very little record at all of the amounts involved. Having failed to keep, or having destroyed the records, they now attack the "best estimates" determined by the court.

Of course, Nate and Ben Miller used their own "best estimates" in opposition to those of the government. After indictment, Nate and Ben Miller and their wives filed amended returns disclosing black market collections totalling $110,-400—$62,000 for 1943, $19,600 for 1944, and $28,800 for 1945. At the trial before the Tax Court, they estimated their overceiling collections to have been twenty-five per cent larger than their previous sworn amended returns: $138,000—$78,000 for 1943, $30,000 for 1944, and $30,000 for 1945.

Of course, under such circumstances neither the Tax Court nor the Commissioner is required to follow the taxpayers' estimates. "[T]he Commissioner may determine the amount of income received by a taxpayer upon any reasonable basis." Lusk v. Com'r, 7 Cir., 1957, 250 F.2d 591, at page 594. See also, Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; Lufty v. United States, 9 Cir., 1956, 230 F.2d 643; Bodoglau v. Com'r, 7 Cir., 1956, 230 F.2d 336, 339; Jack M. Chesbro, 1953, 21 T.C. 123, affirmed per curiam 2 Cir., 1955, 225 F.2d 674. Cf., Quock Ting v. United States, 1891, 140 U.S. 417, 420–422, 11 S.Ct. 733, 851, 35 L.Ed. 501; Cohen v. Com'r, 2 Cir., 1945, 148 F.2d 336.

3. Cf. Currier v. United States, 1 Cir., 1948, 166 F.2d 346, 348.

Other witnesses testified that the figures were much higher than the Millers' best estimates.[4] They were based on what the overceiling charges were, and *the amount of beef sold as shown by corporate records that were kept.*

The Tax Court carefully weighed all of the evidence, noted that it was conflicting and based on estimates, expressed its reservations with respect to the complete reliability of Latimer's testimony, and concluded that the overceiling collections amounted to $167,000 in 1943, $65,000 in 1944, and $80,000 for the first three months of 1945. The Tax Court's findings represent figures which are roughly midway between the figures claimed by Nate and Ben, and those estimated by Latimer and Leising.

■ While perhaps such estimates were not particularly generous to taxpayer, as the Commissioner contends there is sufficient evidence to sustain them, and we cannot hold they were clearly erroneous.

### Issue No. 2.

■■ Were the profits received by Nate and Ben Miller from their purported partnerships in the retail meat market business taxable first to Packing and then to Adolph and his wife as constructive dividends?

Their partnership agreements all came into being between April 9th and June 3rd, 1945. On April 1st, 1945, the collection of overceiling payments on meats sold by Packing ceased. On October 1945 price controls on meat came to an end. All partnership agreements were terminated between July 30th and October 31st, 1945. We have outlined above the peculiar manner in which these partnerships came into being; their peculiar characteristics (such as the hold-harmless agreements favoring the Miller brothers; the investment of only several hundreds but yet profits of many thousands of dollars; the one-week termination clause; the fact that the previous

owner of the business did most of the real work and spent all his time on it while the Millers received fifty per cent of the profits and were required to spend no time on it, but simply to supply the meat).

As we have also pointed out above, the Tax Court found as an ultimate fact that the purpose of these retail market "partnership" agreements was to effect further collections of overceiling prices on meat sold by Packing, without any intention on the part of Nate and Ben to join with the other parties in the conduct of the markets for any other purpose.

We think such a finding clearly justified by the evidence before us. If it was, then for the reasons hereinabove discussed under Issue No. 1, the profits derived by Nate and Ben Miller were corporate assets, and could not be taken out of the corporation by Adolph (even though they were *given* to Nate and Ben), or by Nate or Ben (with the knowledge, sanction, and authorization of Adolph [5]), without proper payment of taxes.

The partnerships were found to be without a business purpose, and not entered into in bona fides. Accordingly, they were properly disregarded, Commissioner v. Culbertson, 1949, 337 U.S. 733, 742, 69 S.Ct. 1210, 93 L.Ed. 1659, and the profits were properly determined to have gone first to the corporation and, thence, diverted for the purposes of its principal stockholder, on which he must pay taxes as though it were actually distributed as a dividend.

### Issue No. 3.

■ Were the secret profits received by Nate Miller from the "sale" of cattle by him to and for Packing taxable first to Packing and then to Adolph and his wife as constructive dividends?

Again we find the facts surrounding the partnership of Nate and Ben Miller, looking to the sale of cattle, startlingly unique.

4. Latimer estimated $250,000 for 1943 and $100,000 for 1944.

5. See testimony of Bernard Goldstein (R. 837), and see testimony of Joe Goldstein (R. 845–846).

In the first place, the cattle sold, in the seven instances reported in 1943 (which resulted in partnership profits of $13,-853.03), were all owned by Packing. Ben contributed no capital and no services. Nate ran the partnership, but says it "wasn't an exact firm. It was just Nate and Ben dividing certain business deals."

In 1944, Nate reported profits on cattle deals of $48,922.15. He testified this was not a single or permanent partnership, but an evanescent partnership where "each transaction was a separate deal." "* * * I would ask various partners whether they wanted to be in on it or not." None of the other partners contributed any capital or services. Latimer was listed as a partner to enable him to report his income from his share of the overceiling collections paid to him. No capital was necessary because Nate *usually* received funds from the buyers before he paid Packing for the cattle that corporation owned, and he *usually* used the corporation's money in buying cattle, receiving it from Packing before he paid the seller of the cattle. With no basis of capital contributions, and no services rendered by the "partners," Nate distributed the certain profits on "any basis I chose."

During these transactions, it must be kept in mind, Nate was the salaried cattle buyer for Packing. His fiduciary obligation to the corporation is not recognized because apparently, "others" in the industry were doing the same thing. And secondly, Adolph was aware of these dealings, although not of their full extent.

The Tax Court held the full amount of the partnership profit was due the corporation. We agree. Miller-Smith Hosiery Mills, supra.

### Issue No. 4.

■ Were the amounts expended by Stock Farms for leveling and preparing its land for crops capital expenditures or ordinary deductible business expense, and were such amounts properly determined?

Stock Farms owned 2,000 acres of land near Blythe, California. It is essential to proper farming and irrigation that such land be leveled and properly graded after each crop in order that best results be achieved. The crops were annual crops consisting of cotton, mylo maize, lettuce, melons and alfalfa.

The figures hereinafter discussed are not in dispute. During 1944, 1945 and 1946, Stock Farms expended $183,647.-07 in "releveling, touching up, knifing, bordering and preparing the land." The petitioners took the entire sum expended as ordinary expenses. Was any portion thereof for permanent improvements of a capital nature and thus not deductible as ordinary and necessary business expense? The Commissioner allowed $307.25 as ordinary expense, and classed $183,339.82 as capital investment. The Tax Court split the disputed items roughly in two, allowing $92,785.17 as ordinary business expense, and classifying $93,647.07 as capital improvement.

Could the Tax Court do this? Stock Farms had failed to make any allocation between ordinary expenses and capital expenses during this three year period. The Commissioner points out that "the principal witness for the taxpayers on this point (Hansard) having refused to estimate a proper allocation, it was surely within the province of the Tax Court to estimate the proper deductions as best it could, on the basis of all the evidence."

We agree, provided the result is based on credible evidence, and is not pure guesswork.

It is noted that respondent introduced no evidence whatsoever with respect to this issue.

We have carefully examined the evidence introduced on this issue, and find no support for the roughly fifty per cent split between capital expenditure and recurring expenses, as made by the Tax Court. It is a guess without factual support.

Clifford Sharp's testimony (as reproduced in the record on appeal and before us) indicates that all his work, totaling $621.25, was ordinary recurring expense.

Harry Hansard testified he and/or his brother were paid $61,305.25 in 1944, $76,493.00 in 1945, and $8,818.00 in 1946. He testified that this work did have a permanent effect on the condition of the land. "Filling up a big slough" and "changing the flow of water" to one direction all have some permanent effect on the ability to use the land for farming irrigated crops. But Hansard would not commit himself to a percentage figure.

Witness Eugene H. Imler, a surveyor, felt "the majority" of the work was of a recurring nature, but that here there was some damage of a nonrecurring nature which had to be repaired, such as the damage from floods.

Belmont Jenecke testified most of the Stock Farms' acreage had been farmed before, and that "more than half, considerably more than half, about maybe 15 per cent (sic) of the total wouldn't be done over again." This statement is somewhat confusing, but we assume the witness changed his intended answer midway in it, and indicated about eighty-five per cent was recurring annual expense—at from $25 to $40 per acre.

Surveyor Imler was recalled and testified as to the percentage involved in capital expenditures. He started with 2,000 acres. Twenty-two acres of slough were repaired. Eighteen acres of sand dune were leveled. Twenty-one acres close to a canal were leveled, and about six more small areas, or sixty-five acres received nonrecurring work—all of which totalled three and one-half per cent of the land. Thus, ninety-six and one-half per cent of the work was of a recurring nature—i.e., ordinary expense.

We have considered the Tax Court judge's opinion with respect to this allocation of costs between current expenses and capital expenditures, and find no basis for his conclusions, i.e., the manner in which the division was made.

Respondent urges that the taxpayers rely on "certain revoked administrative rulings—as if Stock Farms' failure to adhere to basic good accounting practices was somehow compelled by the revoked rulings." We have searched the record and fail to find what "basic good accounting practices" are referred to. We cannot take judicial notice of what they are. Perhaps the reference is to the *complete lack* of *any* allocation by the taxpayers. But under certain circumstances, such as where raw land is leveled and irrigation ditches dug, the greater part, and indeed, one hundred per cent of such original expense might properly be classified, under good and accepted farming accounting practices, as permanent capital expenditures. On the other hand, the annually recurring cost of releveling the land, or the cleaning of ditches not damaged by catastrophic flood waters, might well be one hundred per cent ordinary and necessary expense.

Here we find no credible evidence to support the allocation made by the Tax Court. Nor can we come to a conclusion on it, save by inference and guesswork. We are thus required to remand the matter for additional hearings, and the introduction of further evidence on this limited issue.

We emphasize that the Tax Court here made no choice between two differing theories of accounting, nor any choice between accepting one witness' testimony and disregarding another's. He rejected the only testimony on the subject, and substituted what seemed to him an equitable division. It may indeed be equitable, but it is not based on any credible evidence, nor consistent with the evidence. Hence the cases cited by the respondent, Chesbro v. Com'r, supra; Commissioner v. Union Pac. R. Co., 2 Cir., 1936, 86 F.2d 637; and Cohan v. Com'r, 2 Cir., 1930, 39 F.2d 540, are not controlling nor persuasive.

*Issue No. 5.*

Was the salary paid by Stock Farms to Robert Miller while he was in the army deductible as a business expense? If the answer is negative, was this salary taxable first to Packing and then to Adolph and Pauline Miller as constructive dividends?

Robert Miller, nephew of Adolph and raised by him, had worked for Stock

Farms for six months in 1940 and 1941. In 1943 he was drafted. He was not employed by Stock Farms when he was drafted and had not been since 1941, but by Feed Yards. In 1944, while still in the service, he performed no duties for Stock Farms, but was paid a salary of $3,525.00. There was no evidence that he returned from the service to work for Stock Farms, or that there was ever any agreement that he would do so.

Petitioners rely on rulings and regulations of the Tax Court and the Commissioner that salaries paid by employers during the war to employees who left employment for the service, and who intended to return after their service to employment by the same corporation, were allowable deductions.

But that factual situation did not here exist. And the facts in Berkshire Oil Co., 1947, 9 T.C. 903, are dissimilar. The amount paid by Stock Farms to Robert in 1944 as a purported salary was properly disallowed as deductible expense to Stock Farms. And for the reasons hereinbefore set forth, such salary was properly held the equivalent of a constructive dividend from Stock Farms to Packing and from Packing to Adolph Miller.

*Issue No. 6.*

■ Were the profits realized by Adolph Miller and Meyer Schorr from sale of wheat owned and sold by Stock Farms taxable first as income to Packing and then to Adolph and Pauline Miller as constructive dividends?

In 1945, Adolph purchased for Stock Farms, with its money, over one hundred carloads of damaged Australian wheat, using most of it for cattle feed and fertilizer. Stock Farms, in the same year, sold several carloads of this wheat at a profit of $3,628.80, which Adolph kept and reported on his personal income tax return. In 1946, additional carloads of wheat were sold by Stock Farms at a profit of $12,094.26, which profit Meyer Schorr, a nephew of Adolph's, kept.

Adolph and Meyer Schorr kept these profits from the sale of property owned by Stock Farms. Such profits should have gone to Packing, as the sole stockholder of Stock Farms. The only reason it did not was because Adolph was agreeable to keeping it himself, and permitting his nephew to keep it. This money was taken from Stock Farms, and from Packing, as surely as though it had been stolen or embezzled.[6]

■ It is immaterial that no formal dividends were declared and distributed by Stock Farms to Packing and by Packing to Adolph. A corporation may be charged with constructive receipt of taxable income paid directly to its stockholder. Brooklyn & Richmond Ferry Co., 1947, 9 T.C. 865, affirmed 2 Cir., 1948, 171 F.2d 616. See also Jack M. Chesbro, supra.

■ Additionally, petitioners claim this error for the first time on appeal. Hence, irrespective of the merits of the matter, we are under no duty to examine that point here. Union Pac. R. Co. v. Johnson, 9 Cir., 1957, 249 F.2d 674; Carr v. City of Anchorage, 9 Cir., 1957, 243 F.2d 482, 484; Hebets v. Scott, 9 Cir., 1945, 152 F.2d 739. Cf., Fed.R. Civ.P. 12(h).

*Issue No. 7.*

■ Should a loss sustained by Packing in 1944 on land sold by it be allowed as a capital loss?

The record on this item is extremely brief. Packing's books, kept by a Certified Public Accountant, showed the cost of certain land acquired in 1931 of $18,151.02, and a sales price in 1944 of $9,013.50, less $68.40, cost of sale, or a net loss of $9,205.92.

The Tax Court said in its opinion:

"The respondent determined that no gain or loss resulted from the sale of the land. The only testimony offered to show that a loss resulted was that the books showed a cost of $18,151.02 and selling price of $9,013.50, with cost of sale amounting

---

6. In fact, Adolph Miller stated: " * * * I have sinned."

to $68.40. There was no evidence identifying the land or the circumstances of its purchase or sale. The evidence is not sufficient to prove that respondent erred."

The books of account were admissible in evidence, if a proper foundation was laid for their use. 28 U.S.C. § 1732. Standard Oil Co. of California v. Moore, 9 Cir., 1957, 251 F.2d 188, 215. Uncontradicted, they stand as some evidence that a loss took place. We think the preponderance of evidence supports the *fact* of loss, even if there be no testimony as to the kind of loss.

The Tax Court's conclusion is unsupported by the evidence; no law is cited to support it, and we reverse and remand the matter for further hearing on this limited issue.

### Issue No. 8.

■ Should Packing be allowed to deduct, as a business expense, salary paid by it to Mrs. Hazel Shivel?

In 1942, Mrs. Shivel received as salary $8,185.00, and in 1943, 1944 and 1945 the sums of $8,320 each year as a salary.

The Tax Court concluded that Mrs. Shivel "received this money by virtue of her stockholdings and as a dividend," relying on these facts: (1) Packing as a corporation had no agreement with Mrs. Shivel; (2) Mrs. Shivel performed no services for the corporation; and (3) the payments terminated when she sold her stock. Hence, the salary was disallowed as a business expense.

We are not impressed with respondent's argument here, that the act of Adolph Miller in agreeing with Glen Shivel that the survivor's widow was to be paid a salary by the corporation equal to one-half the deceased's husband's salary, was *not* the act of the corporation, in view of its insistence that Adolph *was* the corporation in other aspects of this case. If it be argued that Adolph *was* Packing only after Glen Shivel's death, it can also be pointed out that it was only after Glen Shivel's death that the payments were made by Packing to Mrs. Shivel.

But whether the payments made to Mrs. Shivel were as a salary or as a dividend is a question of fact for the trier of facts to determine. That determination has been made adversely to petitioners, and is not clearly erroneous. That no services were performed by Mrs. Shivel at any time, and that such payments coincided precisely with the time during which she was a stockholder, are two facts that are extremely persuasive, and sufficient to support the Tax Court's determination of this issue of fact, in the absence of contrary evidence. Fed.R. Civ.P. 52(a). United States v. United States Gypsum Co., 1948, 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746; Wener v. Com'r, 9 Cir., 1957, 242 F.2d 938; Lengsfield v. Com'r, 5 Cir., 1957, 241 F. 2d 508; Weyl-Zuckerman & Co. v. Com'r, 9 Cir., 1956, 232 F.2d 214; Grace Bros., Inc. v. Com'r, 9 Cir., 1949, 173 F.2d 170.

### Issue No. 9.

Was prejudicial error committed by the Tax Court in refusing to admit in evidence alleged impeaching testimony?

We must first consider precisely what petitioners' counsel offered to prove by way of impeachment of the witness Latimer.

Counsel offered to prove by the witness Donald O. Bircher, a former special agent in the Intelligence Unit of the Treasury Department, *first*, "what his investigation showed and that he has knowledge of some of adjustments made in this case." *Secondly*, that "the amounts of liability here were based upon his recommendation * * * that many of those who worked on the case do not agree with the conclusions * * * arrived at here." *Thirdly*, that Ray Latimer had said he had received overceiling prices which he hoped the Millers would never learn about; and *fourthly*, that Ray Latimer and Joe Goldstein, "in making their statements to the Treasury Department, insisted on themselves being granted immunity and that they could not be granted immunity by the agent, but they were in effect given it by the issuance of a summons requiring their

testimony which under the circumstances could not be used against them."

The first two offers of proof are entirely immaterial and irrelevant to any effort to impeach Latimer. The fourth could only be partially proved by testimony of Bircher—i.e., whether Latimer "insisted" on something he did not ultimately receive. The only really impeaching testimony relates to Latimer's alleged third admission that he had received overceiling prices that he hoped the Millers would never hear about.

That is comparable to an attempt to impeach a burglar by his statement that he hadn't divided the loot fairly with his fellow burglars.

However, regardless of how much or how little weight we may think should or could be attached, by the trier of fact, to this offer to impeach such a witness as Latimer by an alleged previous inconsistent statement, we think it was proper impeachment, unless some special rule or statute (such as the alleged confidential nature of the statement) prevented its use.

To emphasize the importance of impeaching Latimer, petitioners cite in detail what Latimer testified to. Latimer is said to have implicated Adolph. We agree. We also agree that the court *could* have relied upon Latimer's testimony to implicate Adolph and Packing. But that testimony was not the sole evidence against them. Latimer's testimony was not even an essential link, necessary before other evidence could be believed.

Petitioners urge that "If Latimer had not testified, or if his testimony were rejected as not credible or not trustworthy, the remaining evidence in the record would be insufficient to sustain the court's decision on this issue." We cannot agree. In fact, we thoroughly disagree. There were at least six other witnesses who implicated Adolph. Latimer, on some subjects was an important witness, and a principal witness, but nowhere has our attention been called to an area where he was the sole witness to a fact essential to the Commissioner's case.

Latimer was impeached, and by petitioners' cross-examination. Petitioners' own brief points out at least eight matters on which Latimer was impeached, either by a previous contradiction, a failure to recollect, or a weak explanation of what he had previously said.

The Tax Court realized and recognized the implication of this impeaching testimony. It specifically stated: "We do not consider his [Latimer's] recollection and estimates entirely reliable." With that comment, the Tax Court dismisses Latimer's testimony on an important element of the case.

 This is not the situation of an unimpeached witness where the trial court relies on his testimony completely and solely, or even largely, and then refuses any offer of evidence to impeach. Latimer was impeached, and the record clearly so shows. It is within the discretion of the trial court, within judicial limits, to limit the nature and extent of impeaching evidence. There is no rule of law that one side, having impeached a witness to the satisfaction of the trial court, may continue on and on with further impeachment. Nor is there any rule of law that a trial court cannot give some credence to the testimony of an impeached witness, no matter how badly impeached. And this is particularly true when there is other competent and unimpeached testimony to support the testimony of the impeached witness. It may be considered arbitrary and unreasonable to allow a trier of fact to reject part of an impeached witness' testimony, and rely on another part. But it is no more arbitrary or unreasonable than the rule that permits the trier of fact to wholly believe one man who testifies and produces conviction in his mind, and entirely reject the testimony of another whose testimony does not produce such subjective conviction. Juries and judges have been doing that from time immemorial.

Furthermore, here the petitioners were allowed to extensively and thoroughly cross-examine Latimer with the aid of a *written* statement given by Latimer to the Internal Revenue Service, of

which counsel for petitioners apparently had obtained a copy.

The impeaching questions proposed to be asked of Bircher related to alleged *oral* statements of Latimer to Bircher relating to unspecified but "substantial" secret profits. Latimer had denied the *fact* of receiving a portion of the alleged secret profits, but had not been asked the foundation question as to whether he had told Bircher that he had received the secret moneys, nor was he asked about any "substantial," but unspecified in amount, secret profits. Thus, strictly speaking, no precise proper foundation had been laid for the impeaching question which was the subject of the Stock Farms offer. But we attach little value to this technical error, for a general question (without naming Mr. Bircher) was asked of Mr. Latimer, and he denied receiving the specified amounts of $25,000 in 1943 and $17,000 in 1944.

We next come to the court's ruling that any statements made by Latimer to Bircher were inadmissible as confidential statements.

We do not find the Jencks case [Jencks v. United States], 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, apposite for two important reasons:

(1) The Jencks case was a criminal and not a civil case. See language, 353 U.S. at pages 670, 671, 77 S.Ct. at pages 1014, 1015.

(2) The Jencks case related to a written record, and to oral statements of which a recording had been made—not to an alleged oral statement never reduced to writing. This becomes particularly important when we consider the rationale of Mr. Justice Brennan's opinion. On page 667 of 353 U.S., on page 1012, of 77 S.Ct., he emphasized that the

" 'demand was for production of * * * *specific documents and did not propose any broad or blind fishing expedition* among documents * * * on the chance that something impeaching might turn up.' [Emphasis supplied by the Supreme Court.]

\* \* \* \* \* \*

"Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness *recording the events before time dulls treacherous memory*." [Emphasis ours.]

Two of the other cases relied on by petitioners are likewise criminal cases and involve written, not oral, impeaching testimony. See, Gordon v. United States, 1953, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447, and United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503.

United States v. Reynolds, 1953, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727, was a civil case under the Federal Tort Claims Act. There the claim of privilege was *upheld*, and the Supreme Court specifically stated that the criminal doctrine that the government can invoke its evidentiary privileges only at the price of letting the defendant go free, has no application to a civil forum where the government is not the moving party but is a defendant only on terms to which it has consented. 345 U.S. at page 12, 73 S.Ct. at page 534.

Thus, under the factual situation here existing, we find the claim of privilege to the alleged *oral* admissions properly upheld; we find no error in the Tax Court's failure to allow the alleged impeaching offer; and we hold that if there were error in such failure, it was not substantial nor prejudicial error requiring a reversal.

The Tax Court's decision is affirmed in all respects, save as to (1) the division as between current ordinary expense and capital expenditures of the cost of leveling and preparing the land of Stock Farms; and (2) the determination that no gain or loss resulted from the sale of land in 1944.

On these two issues alone the decision is reversed and remanded to the Tax Court for further hearing, the taking of further evidence, and a new determination.

Judgment against the Commissioner on his protective cross-appeal is ordered.