Herschell MILLER and Ross Miller, d/b/a
Silver Palm, Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 13324.

United States Court of Appeals
Seventh Circuit.

Dec. 7, 1961.

---

458

Robert J. Downing, Robert G. Lussier, Chicago, Ill. (Raskin & Downing, Chicago, Ill., of counsel), for plaintiffs-appellants.

Lee A. Jackson, Chief, Appellate Section, Robert L. Waters, Atty., U. S. Dept. of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., Chicago, Ill., Louis F. Oberdorfer, Asst. Atty. Gen., Melva M. Graney, Atty., Dept. of Justice, Washington, D. C., Harvey M. Silets, Asst. U. S. Atty., Chicago, Ill., for defendant-appellee.

Before CASTLE, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

Plaintiffs, Hershell Miller and Ross Miller, sued to recover the sum of $2,406.03—later amended to $2,981.82—plus interest from the United States for taxes alleged to have been illegally collected as cabaret taxes pursuant to Section 1700(e), Internal Revenue Code of 1939 (26 U.S.C. § 1700(e) ), assessed for the period November 1, 1949, through May 31, 1953. The government counterclaimed, based on its assessments for the same period, for the sum of $63,472.14 plus interest, less the $2,406.03 collected from plaintiffs. The District Court determined that the taxpayers were not entitled to the refund and rendered judgment on the counter-claim in the sum of $24,989.14. In this appeal plaintiffs contend that the Court made erroneous findings and that it erred in limiting the cross-examination of a government witness.

Plaintiffs during the period November 1, 1949, through May 31, 1953, operated a tavern and cabaret in Chicago known as the Silver Palm. The establishment consisted of two rooms, a front room used as a barroom and a rear room known as the "entertainment room." The entertainment room opened daily between 6:00 p. m. and 7:00 p. m. and, at times, remained open until 7:00 a. m. to 8:00 a. m. A burlesque show with orchestra was presented in the entertainment room nightly from approximately 9:00 p. m. or 10:00 p. m. to sometime between 3:00 a. m. and 4:00 a. m. In short, entertainment was provided approximately half of the time that the room was open.

The legal closing hour for the Silver Palm was 4:00 a. m. At that time, the

"bar" was closed, customers were asked to leave, and the outside lights were turned off. However, the entertainment room occasionally remained open and catered to a clientele consisting, among others, of bartenders, waitresses, and entertainers from nearby establishments.

There was no minimum or cover charge in the entertainment room and plaintiffs absorbed the twenty per cent cabaret tax. The prices in the entertainment room, however, were higher than in the bar before and after, as well as during the show.

The receipts of the Silver Palm as reflected in its records were categorized as follows:

(a) "Bar" Barroom receipts were not declared and are not subject to the cabaret tax.

(b) "Show" That portion of the receipts collected during the hours in which entertainment was provided.

(c) "After Show" That portion of the receipts collected during hours in which no entertainment was provided.

(d) "Cabaret Tax" That portion of the show receipts which was payable to the District Director of Internal Revenue.

The excise tax returns were prepared by accountants, based on figures given them by the taxpayers. These figures were obtained by the taxpayers from the cash register tape subtotals. In other words, taxpayers would push the subtotal key on the cash register when the entertainment started and again when it ended and by a process of subtraction arrive at the amount of the show receipts. The figures were then given to the accountants.

For the period November 1, 1949, through December 31, 1950, plaintiffs included in their show receipts those sales made in the entertainment room before the show and sales made up to one and one-half hours after the show. On the advice of their accountant, plaintiffs initiated a new procedure for the period January 1, 1951, through May 31, 1953, whereby only the receipts received during the hours in which entertainment was provided were listed as show receipts.

Concurrent with this new procedure the show receipts which had amounted to 59.6% of the total entertainment room receipts during the month of December, 1950, and which had varied between 54% and 60% of the total receipts in prior months, dropped to 22.1% for the month of January, 1951. For the subsequent months, show receipts accounted for approximately 12% of the total entertainment room receipts.

Plaintiffs contend that this unusual decrease in show receipts is accounted for by the fact that while the burlesque show was declining in popularity the after-hours business was thriving on the "good spending" clientele of bartenders, waitresses, and entertainers from other businesses which closed at 4:00 a. m.

The District Director's assessments were based on a determination that all of the receipts from the entertainment room were show receipts and therefore subject to the cabaret tax. The District Court found the assessments to be "partially excessive." The Court further found that plaintiffs had not accurately reported the amount of show receipts for the period January 1, 1951, through May 30, 1953. The judgment in favor of the United States was based on a finding that 50% of the total entertainment room receipts during this period should have been reported as show receipts.

The question presented is whether the District Court's finding of the amount of sales which occurred during show hours after January 1, 1951, is clearly erroneous.

The District Court found and the record shows that the plaintiffs did serve refreshments in the entertainment room at times other than show times. Indeed, there is evidence that the entertainment room was, at times, open as much as twelve hours while entertainment was

presented for only six of these hours. It seems clear that the Court correctly determined the Director's assessment was excessive. Government counsel so admitted during oral argument.

■ Once the Director's assessment has been shown to be excessive, the presumption of the validity of the assessment is destroyed and the burden of proof is on the Director to show whether any deficiency exists and, if so, the amount. Cohen v. C. I. R., 9 Cir., 266 F.2d 5.

■■ The fact, however, that the assessment was excessive does not mean that evidence cannot be submitted which justifies an assessment in some lesser amount. When the assessment is shown to be erroneous, it is the duty of the court to determine what amount of tax, if any, is proper. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; Rogers v. C. I. R., 7 Cir., 248 F.2d 452. The court need not, in making this determination, be able to precisely establish the correct figures; reasonable approximations may be employed (Cohan v. C. I. R., 2 Cir., 39 F.2d 540), provided the findings disclose the method used in calculating the deficiency. Cohen v. C. I. R., supra.

The District Court did not accept plaintiffs' explanation of the sudden drop in show receipts from an average of approximately 55% of total entertainment room receipts to an average of approximately 12%. Plaintiffs' explanation was that after January 1, 1951, only receipts collected during the show hours were reported for tax purposes, whereas most of the receipts were collected after-hours. While there was evidence of after-hours sales, the Court concluded it was unreasonable to believe that such a small percentage of the total sales occurred during the six hours of continuous entertainment.

The evidence shows that the cost of entertainment was approximately four times the amount of reported show re-

ceipts. The heaviest concentration of bartenders and waitresses on duty occurred during show hours and no overtime payments were evident in plaintiffs' records. There was no complaint or police record of operating during illegal hours. Two of plaintiffs' employees testified that they closed at 4:00 a. m. and knew of no after-hours activity.

Before January, 1951, the show receipts had been 54% or more of the total entertainment room receipts. In January, 1951, the receipts dropped to 22.1% of the total entertainment room receipts. Thereafter, the show receipts ranged from 12.2% to as low as 10.3% of the total entertainment room receipts. Following the taxpayers' theory, this difference in percentage before and after January, 1951, must reflect the amount of revenue previously collected during the period before the show (when there were few patrons in the entertainment room because prices in the barroom were cheaper) and up to one and one-half hours after the show. In this connection, it is to be noted there is testimony in the record that the show was usually discontinued when the number of customers became too few to continue profitably.

■ The District Court found that the show receipts accounted for 50% of the total entertainment room receipts. This finding is not represented to be an exact determination. However, in view of the distribution between total entertainment room receipts and show receipts prior to January 1, 1951, (approximately 55% after show and 45% show receipts) the ratio of show hours to total hours open, and the evidence previously set out, there is substantial support in the record for invoking the Cohan rule. Admittedly, the government's evidence was circumstantial but it was within the District Court's province to accept it over plaintiffs' records and portions of their direct testimony. We cannot say the District Court's findings of fact were clearly erroneous.

A government witness, an employee of the Internal Revenue Service, testified on direct examination that based on his audit of similar establishments in the Chicago area cabarets generally realized from 90% to 100% of their receipts during the entertainment period. On objection, counsel for plaintiffs was not permitted to cross-examine as to the identity of the businesses which had been audited. Plaintiffs say this was error.

Since the District Judge stated that he could not "attach too much significance" to the testimony of the government's expert witness and there being ample evidence absent such testimony to sustain the Court's determination, it could not have been prejudicial in a non-jury case for the Court to refuse to allow the attempted cross-examination. Any error in this context was harmless.

The judgment is affirmed.