**John and Betty MacGUIRE, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 30258.**

United States Court of Appeals, Fifth Circuit.

Nov. 3, 1971.

Rehearing Denied Dec. 7, 1971.

Towner Leeper, El Paso, Tex., for petitioners-appellants.

Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., Dept. of Justice, K. Martin Worthy, Chief Counsel, I. R. S., William Massar, Kenneth L. Gross, Charles E. Anderson, Attys., U. S. Dept. of Justice, Washington, D. C., for respondent-appellee.

Before SKELTON, Judge,* and MORGAN and CLARK, Circuit Judges.

* Honorable Byron G. Skelton, U. S. Court of Claims, sitting by designation.

**1240**

MORGAN, Circuit Judge:

On their joint federal income tax returns for 1961, taxpayers John and Betty MacGuire reported a long-term capital gain of $700,000 on a claimed disposition of stock in a Mexican corporation, Cia. Ganadera Sahuarito, S.A. (hereinafter Sahuarito). By a notice of deficiency dated August 6, 1965, the Commissioner determined that the $700,000 should be taxed as ordinary income, and that there was a deficiency in the taxpayers' return of $436,521.74. Taxpayers sued in the United States Tax Court to set aside the ruling of the Commissioner. The Tax Court sustained the Commissioner's determination, and the taxpayers have appealed to this court. We affirm the decision of the Tax Court.

## I. *Background*

This tax dispute grows out of a complicated series of transactions in Mexico and Texas which took place over a span of two decades, and we shall attempt here only to outline the principal events. In 1942, Betty MacGuire's father, Lee Moor, formed a cattle corporation in Mexico known as Sahuarito. Moor was the largest shareholder, owning 1,950 of the 3,000 shares issued. The remainder of the shares were owned by three of Mr. Moor's employees, Fernando Villalobis (450 shares), Ashley Mershon (300 shares), and Robert Cook (300 shares). Under its charter, Sahuarito was permitted to engage in the cattle business but was barred from owning land. Consequently, Mr. Moor supplied funds to "straw owners" who bought land and leased it to Mr. Moor. In addition Villalobis owned some 145,173 acres of land acquired previously in an unrelated transaction which he leased to Moor. Moor in turn subleased all this land to Sahuarito. On this land, a total acreage in excess of 300,000 acres, Sahuarito raised thousands of imported pure bred Hereford cattle. In 1950, the ranch foreman Mershon quit and his stock in Sahuarito was retained as treasury stock.

Cook also quit in 1950, and, at the behest of Moor, transferred his shares to the taxpayer John MacGuire.

In 1951, Mr. Moor acquired, for the benefit of the taxpayers, another Mexican cattle company known as Terrenates,[1] located 120 miles south of Sahuarito. Moor acquired a 98 percent interest in the company and Villalobis, two percent. Shortly thereafter, Moor transferred a 90 percent interest in Terrenates to John MacGuire, and the remaining eight percent to his daughter, Betty MacGuire. Terrenates owned 98,963 acres of land.

In September 1951, armed Mexican soldiers expropriated the Sahuarito lands and informed Moor's employees that all cattle on the ranch must be removed or be auctioned off as strays. Shortly thereafter, Villalobis and the former ranch foreman Mershon protested the order to a Mexican judge, but were informed that the Sahuarito lands had been sold to Mexican citizens and that the cattle must be removed. As a result, between 5,400 and 5,500 head of cattle were removed from Sahuarito by the end of 1952. Approximately 2,950 were driven over land to Terrenates and the rest were sent to slaughter houses in Juarez. As of June 30, 1952, the only asset shown on Sahuarito's books was an account receivable from Terrenates in the amount of $47,350.87. By December 31, 1952, Sahuarito's books reflected no assets. Shortly after Sahuarito was confiscated, Mr. Moor converted his 1,950 shares into treasury stock and delivered them to Villalobis. Thereafter, the sole remaining stockholders in Sahuarito were Villalobis with 450 shares and the taxpayer John MacGuire with 300 shares. At the request of Moor, Vallalobis then filed with the Mexican government a formal notice of suspension of operations by Sahuarito.

The ranching operations at Terrenates were small at the time of the expropriation of Sahuarito, there being only about 1,000 head of cattle on the ranch. The

---

1. Terrenates was a Mexican limited liability company taxable as a corporation.

cattle from the two ranches were not kept separate but were combined into one large herd on the Terrenates ranch. From 1952 until 1958, cattle from this combined herd was sold from time to time in Texas and the money was deposited to the account of Terrenates. No effort was made to segregate the proceeds from the sale of cattle which had originally been on the Sahuarito ranch since Sahuarito was considered to be out of business. Lee Moor bought many of these cattle and, at the time of his death, owed a note for them payable to Terrenates in the sum of $467,641.99, which was paid out of his estate after his death.

Lee Moor became ill in 1957 and died on December 15, 1958. Although John MacGuire owned 90 percent of Terrenates, he did not begin managing the company until Moor became ill in 1957. Between July 31, 1958, and December 31, 1960, MacGuire borrowed a total of $577,019.66 from Terrenates and issued personal notes therefor. The funds were obtained by MacGuire by depositing to his personal bank accounts checks payable to Terrenates. In addition MacGuire wrote checks on the Terrenates checking account and deposited them in his personal accounts. All of the monies so obtained by MacGuire were deposited in bank accounts in El Paso.

MacGuire testified that his purpose in concentrating these funds in Texas was to strengthen his bargaining position in a dispute which he anticipated with Moor's employee Villalobis. As noted, MacGuire and Villalobis were the sole remaining shareholders in Sahuarito. Villalobis had never been compensated for the loss of his lands on the Sahuarito ranch. In addition, he had never received any of the proceeds from the sale of cattle by Terrenates which originated from the Sahuarito ranch. MacGuire anticipated that, with Moor out of the way, Villalobis would now assert a claim against a portion of the assets of Terrenates. Because of the possibility of litigation in the Mexican courts, MacGuire deemed it prudent to remove the liquid assets of Terrenates from Mexico.

## II. The Disputed Transaction

On January 31, 1961, taxpayer MacGuire borrowed $600,000 from the First National Bank of Dallas through the Chelmont State Bank (where Terrenates had an account) and deposited the proceeds in his personal account. He then repaid his total indebtedness to Terrenates, $577,019.66 plus interest of $21,380.97, by depositing his check for $598,390.63 in the Terrenates checking account in the Chelmont State Bank. MacGuire then drew two checks aggregating $700,000 on the Terrenates checking accounts (one in the amount of $655,000 drawn on the Chelmont State Bank; the other for $45,000 drawn on the account at the State National Bank of El Paso) and deposited them to his personal account at the Chelmont State Bank. The next day, MacGuire drew a check on his personal account to the Chelmont State Bank in El Paso in payment of the $600,000 loan of the previous day plus interest for one day in the amount of $83.00. On the same day, he closed out the Terrenates checking account at the State National Bank. It is the taxpayers' receipt of this $700,000 which is the subject of this tax dispute. During the course of this litigation, taxpayers have advanced no fewer than four different explanations of that transaction which would, in their view, qualify the transaction for capital gains treatment.

Taxpayers' initial story was that the $700,000 was received as consideration for the sale of 100 shares of Sahuarito stock to Terrenates. At the time of the transaction, MacGuire advised his bookkeeper that such a sale had occurred, and the bookkeeper made the appropriate notations in the taxpayers' accounting records to reflect such a sale. Adhering to the same story, the taxpayers on their joint federal income tax return for the taxable year 1961 reported the $700,000 as a long-term capital gain from the sale of the 100 shares of Sahuarito to Terrenates. However, the Commissioner, on audit, denied the long-term capital gain treatment and determined that the $700,000 was taxable as ordinary income.

In September 1964, Internal Revenue Agent Felix Lopez interviewed taxpayer in the presence of his auditor and counsel as well as Lopez's supervisor. At this juncture, the taxpayers' story changed. He stated that the $700,000 was received from the sale of 300 (not 100, as reported on his 1961 tax return) shares of Sahuarito stock to an unknown purchaser (not to Terrenates as originally claimed). Taxpayers' auditor indicated that it was his error that the 1961 return reflected a sale of 100 shares instead of 300 shares. When MacGuire was asked how the sales price of $700,000 was arrived at, he stated that Villalobis had handled the sale, and that the taxpayer did not know who the purchaser was.

Agent Lopez then discussed the transactions with Villalobis, who stated that MacGuire's stock in Sahuarito had been purchased by one Jose Terasas, but was unable to explain how the $700,000 sales price was reached. When questioned as to the value of the Sahuarito stock, Villalobis acknowledged to the agent that Sahuarito's land had been expropriated and its cattle sold. Agent Lopez suggested that the stock must have been worthless, and Villalobis replied that Sahuarito might have had money received from the sale of cattle. This was the entire explanation of Villalobis for the $700,000 transaction. Villalobis did not make any contention at this meeting, as was later claimed, that an element in the transaction was the transfer to him from petitioner of an ownership interest in Terrenates.

In the Tax Court, MacGuire once again altered his story. There taxpayer claimed that the $700,000 was received in exchange for a transfer of a portion of taxpayers' interest in Terrenates to Villalobis and for the settlement of their interests in Sahuarito. Taxpayer asserted that an oral agreement had been reached with Villalobis on April 9, 1961, under which Villalobis was to receive an enlarged interest in Terrenates and taxpayer was to retain the $700,000 already taken from the Terrenates accounts in El Paso. In return, Villalobis allegedly agreed not to bring suit against MacGuire or Terrenates in Mexico to recover his share of the proceeds from the sale of Sahuarito cattle. Villalobis' share was originally to have been increased from two percent of Terrenates to 50 percent. A petition was filed with the Mexican Foreign Office in November 1961 to effect transfer of interests to Villalobis, but was denied because Mexican citizens did not own at least a 51 percent interest in the business. Thereafter, MacGuire agreed to transfer to Villalobis a 55 percent interest in Terrenates. A second petition was filed with the Mexican Foreign Office on February 20, 1962, and was approved on March 20, 1962. On March 24, 1962, Terrenates' ownership register was changed to reflect a 55 percent interest in Villalobis and his wife, and a 45 percent interest in taxpayer and his wife Betty. In addition, the taxpayers advanced an alternative theory in the Tax Court that the $700,000 was received by MacGuire as a non-taxable distribution in liquidation of Sahuarito, which was liquidated in 1952.

In the Tax Court, the Commissioner offered no affirmative theory as to why the $700,000 should be taxed as ordinary income, but rather relied on the presumption of correctness attaching to his determinations. The Tax Court ruled that the burden of proof was on the taxpayers to produce sufficient evidence to justify capital gains treatment. The Tax Court concluded as a finding of fact that the taxpayers had failed to present sufficient evidence to convince the court that the $700,000 was received by MacGuire as consideration for the transfer of his interest in Terrenates to Villalobis and the settlement of interest in Sahuarito. The Tax Court also rejected the taxpayers' theory that the $700,000 was received by MacGuire in liquidation of his interest in Sahuarito.[2]

2. This argument has been abandoned by the appellants on appeal.

III. *Conclusion*

On appeal, appellant argues that the Tax Court improperly relied upon the presumption of correctness attaching to the Commissioner's determinations. Appellant contends that the presumption of correctness disappears upon the introduction of substantial evidence by the taxpayer. Cf. Stout v. Commissioner of Internal Revenue, 4 Cir. 1959, 273 F.2d 345, 350. Appellant argues that it was "fundamental error for the Tax Court to reject substantial evidence that was corroborated and uncontradicted in preference to the Commissioner's presumption". We disagree.

As a preliminary matter, it should be noted that we do not have here a case in which the Commissioner offered no evidence and merely rested on the presumption of correctness. The Commissioner called two witnesses. Hugh Gibbons, MacGuire's former bookkeeper, was subpoenaed by the Government and gave testimony which directly contradicted MacGuire's story. The Commissioner also called revenue agent Lopez who testified concerning the contradictions in the taxpayers' stories at the various stages in the case.

The Tax Court committed no error with respect to the burden of proof. This was a case in which it was stipulated that the taxpayers withdrew $700,000 from a corporation (Terrenates) controlled by them. The burden was on the taxpayers to establish by a preponderance of the evidence that this income was derived from a transaction which qualified for long-term capital gain taxation, Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 106, 79 L.Ed. 648 (1935). That burden is not shifted by the mere fact that the taxpayers introduced evidence on their behalf. United Aniline Co. v. Commissioner of Internal Revenue, 1 Cir. 1963, 316 F.2d 701.

Thus, the sole substantial question in this appeal is whether there was sufficient evidence in the record to support the Tax Court's ruling. Whether the $700,000 was received, as the taxpayers now claim, in consideration for the transfer of interest in Terrenates and the settlement of interests in Sahuarito is a question of fact on which the Tax Court's decision cannot be disturbed unless shown to be clearly erroneous. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). After a careful review of the record, we conclude that there was ample basis for the Tax Court's refusal to find that the $700,000 was received in consideration for the transfers of taxpayers' interests in Terrenates and settlement of their interest in Sahuarito. The record revealed numerous inconsistencies in the stories advanced by the taxpayers. No purpose would be served by restating those contradictions here since the Tax Court's opinion ably points them out.[3] It is sufficient to observe

3. The Tax Court, in its Memorandum Findings of Fact and Opinion, noted the following:

How can one reconcile the original claim of Mr. Villolobis [sic] that he sold the 300 shares of stock of Mr. MacGuire in Sahuarito to a Mr. Jose Terasas, and embellish his claim with the details that the proceeds were put in a Terrenates bank account in Mexico and that Terrenates permitted Mr. MacGuire to withdraw the sales price from its bank account in the United States, with his claim at the trial that the Sahuarito stock of Mr. MacGuire was not actually sold by him, but he let Mr. MacGuire keep the $700,000 taken from the Terrenates bank accounts in El Paso in return for Mr. MacGuire turning in his 300 shares of Sahuarito stock, Mr. MacGuire transferring to him an interest in Terrenates and his agreeing not to sue Mr. MacGuire?

How can one reconcile the testimony of Mr. MacGuire that the 300 shares of Sahuarito stock were transferred away from him in connection with his agreement with Mr. Villolobis, [sic] and the testimony of Mr. Villolobis [sic] that he did not remember if the 300 shares of stock were mentioned by him and Mr. MacGuire and whether the shares played any part in connection with their negotiations?

* * * [How can one explain] that with the disposition of 300 shares of Sahuarito stock by Mr. MacGuire claimed to be an integral part of the $700,-

**1244**

that the evidence fully supports the Tax Court's conclusion that "the record is not at all clear. Indeed it is extremely cloudy and * * * what emerges is still confused, sketchy and basically highly implausible factual setting on which * * * [taxpayers] rel[y]".

█ There is no merit in the appellants' contention that the Tax Court was bound to accept the taxpayers' evidence because it was "corroborated and uncontradicted". As we have noted, the taxpayers' story was both contradictory and contradicted. Moreover, it is well established that the Tax Court is not bound to believe even uncontradicted testimony of interested parties where the testimony appears highly improbable. Clark v. Commissioner of Internal Revenue, 9

Cir. 1959, 266 F.2d 698; Thomas E. Snyder Sons Co. v. Commissioner of Internal Revenue, 7 Cir. 1961, 288 F.2d 36; Hallabrin v. Commissioner of Internal Revenue, 6 Cir. 1963, 325 F.2d 298; Winters v. Dallman, 7 Cir. 1956, 238 F.2d 912; Pool v. Commissioner of Internal Revenue, 9 Cir. 1957, 251 F.2d 233. As this court held in Boyett v. Commissioner of Internal Revenue, 5 Cir. 1953, 204 F.2d 205, 208:

The Tax Court not only may, but should, base its findings on the testimony it believes to be true, rejecting after due consideration that which it believes is false. Although positive and uncontradicted testimony as to a particular fact will ordinarily be accepted, a court may reject testimony

000.00 transaction, that at the trial Mr. Villolobis [sic] did not remember receiving any Sahuarito shares from Mr. MacGuire? How can one reconcile the testimony of Mr. Villolobis [sic] that the disposition of the 300 shares of Sahuarito stock of Mr. MacGuire that formerly belonged to Mr. Cook was an integral part of the $700,000.00 transaction with his testimony that in 1962 he thought Mr. Cook still had his 300 shares? And how can you reconcile this testimony with the testimony of Mr. Villolobis [sic] that he sold these same shares to Jose Terasas?

Other portions of the record also present unanswered questions, which cast doubt on petitioners' contentions:

Is it reasonable that Mr. MacGuire, who owned 98 percent of Terrenates and who had $700,000.00 under his complete control, would voluntarily go to a 2 percent owner who does not know of the $700,000.00 and suggest the transaction that is now alleged to have taken place?

How can one reconcile Mr. MacGuire's claim that Terrenates was worth one and one-half million dollars on January 31, 1961, with his balance sheet prepared as of one month earlier on December 31, 1960, reflecting his 98 percent interest in Terrenates to have a fair market value of $100,000.00?

None of the $700,000.00 received by Mr. MacGuire could be identified by him as Sahuarito money.

Why did Mr. MacGuire, who maintained a double entry set of books kept by a bookkeeper and audited by a firm

of certified public accountants, not record the $700,000.00 transaction as it is now explained to the Court if the status of the circumstances on January 31, 1961, was as it is now claimed?

Doesn't it seem peculiar that for a transaction of this size and magnitude, there was no written agreement?

How can it be said there is a bona fide connection between the receipt by Mr. MacGuire on January 31, 1961, of $700,000.00 belonging to Terrenates and the transfer by Mr. MacGuire to Mr. Villolobis [sic] of an interest in Terrenates and stock in Sahuarito, when it was only after Mr. MacGuire "got my full amount, 700,000, * * *. Then I made my deal with Mr. Villalobos"?

Why is it petitioners were unable to explain at the trial even approximately how much of the $700,000.00 received by Mr. MacGuire was in liquidation of Sahuarito and how much was received by him for transferring an interest in Terrenates to Mr. Villolobis [sic]?

In attempting to show a connection between the receipt by Mr. MacGuire of $700,000.00 and the transfer by Mr. MacGuire to Mr. Villolobis [sic] of an interest in Terrenates and stock in Sahuarito, how can one reconcile the testimony of Mr. Villolobis [sic] that the deal with Mr. MacGuire was not made until April 9, 1961, with the fact that Mr. MacGuire took over to himself on January 31, 1961, complete possession of the $700,000.00 and expended almost all of this amount on his personal obligations on the same date?

which, as here, is inherently improbable or manifestly unreasonable, even though no contradictory testimony is offered.

In sum, there was ample basis in the record for the Tax Court's refusal to believe appellants' story that the $700,000 was received in consideration for the transfer of interest in Terrenates and settlement of interests in Sahuarito. Having rejected this explanation, neither the Tax Court nor the Commission was under a duty to offer an alternative theory of the transaction which would result in ordinary income treatment. Taxpayers' receipt of $700,000 income was undisputed. In the absence of a convincing showing otherwise, the $700,000 was properly taxable as ordinary income.

Accordingly, the judgment of the Tax Court is

Affirmed.

SKELTON, Judge (concurring in part and dissenting in part):

John and Betty MacGuire, husband and wife, taxpayers, filed a joint return of their income tax for 1961, in which they reported $700,000 received by them for the sale of their interest in a Mexican corporation, Cia. Ganadera Sahuarito, S.A. (Sahuarito), as long term capital gain. The Commissioner of Internal Revenue determined that the $700,000 should be reported as ordinary income and issued a deficiency notice which resulted in a deficiency of $436,521.74. Taxpayers sued in the United States Tax Court to set aside the ruling of the Commissioner. The Tax Court sustained the determination of the Commissioner, and taxpayers have appealed to this court.

The facts in the case are somewhat involved and deal with ranching transactions in Mexico for twenty years prior to the filing of the returns in this case in 1962 (for 1961). The taxpayers are citizens of the United States. The bulk of the property involved here was accumulated by Betty MacGuire's father, Lee Moor. He was a rugged individualist who started as a cowpuncher in 1900 earning $25.00 per month. Before his death in 1958, at the age of 88, he had accumulated a substantial fortune in excess of six million dollars. The events giving rise to this lawsuit began in 1942 when Lee Moor formed a Mexican Cattle Corporation known as Sahuarito. He was the largest shareholder with 1,950 shares out of a total issue of 3,000 shares. The next largest amount of 450 shares was owned by one Fernando Villalobis, a Mexican, who later played an important part in this case, as shown below. There were two other minor stockholders, who were employees, namely, Mr. Ashley Mershon with 300 shares and Mr. Robert Cook with an equal number. In due time, Mershon turned in his 300 shares which was held as treasury stock, and Cook transferred his 300 shares to taxpayer. This corporation could engage in the cattle business, but under Mexican law could not own land, presumably because Mr. Moor, the controlling stockholder, was not a Mexican. Mr. Moor furnished money to "straw owners" who bought land and leased it to Moor. Mr. Villalobis owned some 145,173 acres which he leased to Moor. Moor subleased all this land (over 500 sections) [1] to Sahuarito. The company prospered and raised many thousands of imported pure bred Hereford cattle.

In 1950, Mr. Moor acquired another cattle company in Mexico named Terrenates for $250,000. He acquired 98 percent of the stock and Villalobis two percent. In 1951, Moor transferred 90 percent of the stock to John MacGuire and the remaining eight percent to his daughter, Betty MacGuire. Terrenates owned 98,963 acres (over 154 sections) of land, which ownership was permitted under Mexican law presumably because it was owned by Terrenates prior to the time Mr. Moor bought controlling interest.

---

1. A section is 640 acres.

Mexican cattle were under quarantine in the United States because of the hoof and mouth disease most of the time from 1947 to 1951. Both Mr. Mershon and taxpayer testified that during this period the cattle herd at Sahuarito was built up and increased considerably. This was because there was very little market in Mexico for the cattle when the border was closed and there was no place to sell them. Taxpayer said that he attended the roundup at Sahuarito in 1950 or 1951 and personally counted 6,500 cows and 10,000 calves on the ranch.

In 1951, Mexican soldiers, armed with rifles and machine guns, occupied Sahuarito and confiscated it for certain political figures in the area where it was located, and ordered all cattle removed from the ranch or they would be shot as strays. Mr. Villalobis protested to a Mexican judge, but was told that nothing could be done except obey the order. Some of the older cattle were taken to the slaughter house at Juarez, but most of the herd was driven overland to Terrenates, which was about 120 miles from Sahuarito. This had to be done as an emergency measure, as there was no other place to take them. Mr. Mershon testified that he helped move the cattle and that between 5,400 and 5,500 head were moved from Sahuarito to Terrenates. Mr. MacGuire said at the trial that most of the 6,500 head of cattle and 10,000 calves he had counted at the Sahuarito roundup were moved to Terrenates. The moving of the cattle was confirmed by Villalobis. At the time the cattle were moved, Terrenates only had about 1,000 head of cattle on the ranch. The ranching operation there was small compared with that of Sahuarito. The cattle from the two ranches were not kept separate but were combined in one herd. In due time, the quarantine was lifted at the Texas border and from time to time cattle from the Terrenates ranch were sold across the border and the money deposited to the account of Terrenates. None of the deposits were made in the name of Sahuarito, as it was considered to be out of

business, although its cattle that were being sold were the source of most of the deposits. Lee Moor bought many of these cattle and at the time of his death, owed a note for them payable to Terrenates in the sum of $467,641.09, which was paid out of his estate after his death, deposited to Terrenates, and which is part of the fund in controversy here.

After Sahuarito was taken over by the Mexican soldiers, Mr. Moor turned his 1,950 shares into Treasury stock and delivered them to Villalobis, secretary, for the purpose of filing a notice of suspension of activities with the Mexican Government. This was accordingly done. At this time, the sole remaining stockholders of Sahuarito were taxpayer with 300 shares and Villalobis with 450. They were entitled to all the remaining assets of Sahuarito, which consisted of the unsold cattle moved to Terrenates and its increase, money on deposit and notes in the name of Terrenates for cattle already sold, and other property moved from Sahuarito to Terrenates.

Lee Moor died in 1958. He had been a dominant factor, and, in fact, the controlling personality in the affairs of Sahuarito and Terrenates during his lifetime. Although John and Betty MacGuire, his son-in-law and daughter, owned 98 percent of Terrenates and almost one-half of what was left of Sahuarito, they dared not cross him with respect to the affairs of these ranches and the cattle business, but always yielded to his wishes and decisions. After his death, the situation was naturally changed. MacGuire knew that many Sahuarito cattle that had been moved to Terrenates had been sold. He started looking for the money in bank accounts in Mexico and Texas. He found various accounts in the name of Terrenates, but none deposited to Sahuarito. He found the note of Lee Moor payable to Terrenates in the sum of $467,641.09 and concluded it was for Sahuarito cattle purchased by Moor. MacGuire had this note paid, but deposited the money to the account of Terrenates in a Texas bank. He also transferred the Mexican accounts

of Terrenates to Texas banks. His purpose in concentrating this money in Texas banks was to place himself in control of it so that he could make a settlement with Villalobis with respect to the assets of Sahuarito. Taxpayer figured that he would face a showdown with Villalobis regarding the assets of Sahuarito sooner or later and he wanted to be in a position of strength in dealing with him. The conclusions of taxpayer in this regard proved to be well founded. Soon after Lee Moor died, Villalobis complained to taxpayer that he had never been paid for the land he had lost in the Sahuarito deal, nor for his share of the Sahuarito cattle and property moved to the Terrenates ranch, nor for his personal services at Sahuarito during the past sixteen years. He wanted a settlement made and so informed MacGuire. At that time, Villalobis valued Terrenates at $1,239,664.74, consisting of 40,050 hectares of land,[2] at $20 per hectare, 2,635 head of cattle at $120 per head, and other assets at $122,464.74. MacGuire valued Terrenates at $1,500,000 consisting of $1,000,000 for the land and $500,000 for the cattle.[3] In addition to both these valuations, there was on deposit to the credit of Terrenates in an El Paso, Texas, bank, the sum of $700,000.[4]

After several meetings between MacGuire and Villalobis, they made a verbal agreement of settlement on January 31, 1961, whereby MacGuire and wife were to keep the $700,000 mentioned above which they withdrew from the bank and one-half of the shares of stock of Terrenates and would transfer one-half of the stock of Terrenates, along with 300 shares of Sahuarito,[5] being all the shares of Sahuarito they owned, to Mr. and Mrs. Villalobis, equally. Villalobis wanted a written agreement covering this settlement drawn up and executed by the parties. He employed a Mexican attorney named Saloman Acosta Baylon to prepare the documents. This was done and the papers were signed April 9, 1961, but the Mexican Foreign Office refused to approve them because Americans owned more than 49 percent. The papers were then redrawn, by agreement, to show that MacGuire and wife owned 45 percent of Terrenates and Villalobis and wife owned 55 percent. These new papers were signed February 20, 1962, and approved by the Mexican Foreign Office on March 20, 1962, and made final on March 24, 1962.

The MacGuires reported the $700,000 received by them in this transaction as long term capital gain in their income tax returns for 1961. The Commissioner determined that it should be reported and taxed as ordinary income, and assessed a deficiency of $436,521.74 against the taxpayers.

At the trial in the Tax Court, the taxpayers proved the foregoing facts, showing that the cattle and property of Sahuarito were physically transferred to Terrenates, that they and Villalobis were the sole stockholders of Sahuarito, that Terrenates was constituted and owned as above set out, and had property and assets as listed above, and that taxpayers owned 98 percent of Terrenates and Villalobis owned two percent. They proved further that a settlement was made between taxpayers and Villalobis with regard to Sahuarito and Terrenates representing over 16 years of ranching work in Mexico, as outlined above, whereby the taxpayers received $700,000 in money and Villalobis and wife acquired all of the stock of Sahuarito and 55 percent of the stock of Terrenates.

Evidence of the settlement between taxpayers and Villalobis is shown in pertinent part by the following testimony. John MacGuire testified:

Q. * * * It's been stipulated that there was some $700,000 accumulated in

---

2. A hectare of land is 2.47 acres.

3. Clint Murchison, of Dallas, Texas, had offered to buy Terrenates for one million dollars cash, which was refused.

4. MacGuire had borrowed $577,019.66 of this money, but repaid it with $21,370.97 interest.

5. Taxpayers and Villalobis were the sole remaining stockholders of Sahuarito.

Terrenates' bank accounts which you have withdrawn for a period of time but settled up on January 31, 1959—1961; do you remember so doing?

A. Yes.

Q. Tell us about this and why.

A. After Mr. Moor passed away, it was the first time I had access to any of the income from the place—knew anything about it—and was amazed at how much money I was able to find. I—part of it came from the estate of Lee Moor on notes to Terrenates that was repaid and deposited in the account in El Paso, which I could control it with only my signature, and I then borrowed all of this money and gave note for it with interest, with the going rate of interest, and paid the interest each year into that account. Then my thought on the matter was that realizing that there were only two shareholders left in Sahuarita where this money had come from originally, I then got ahold of Mr. Villalobis after I had control of the money, and with Mr. Lee Moor gone, I felt that he then would be free to sue me.

Q. Mr. Villalobos?

A. Mr. Villalobos in Mexico for my portion that he felt might belong to him.

Q. Any portion of what?

A. Of the $700,000. I told him what I had done, that I had accumulated this 700,000 out of receipts out of accounts receivable and banked it, deposited it, what I found in the name of Terrenates and told him I want to make a settlement with him on the dissolution of Sahuarita.

After quite a few negotiations, we came to the conclusion that he would keep half of Terrenates and let me have half—to have all of the $700,000 and I would have no litigation in Mexico which, as an American I could not stand, and that was our arrangement.

Q. Was it carried through?

A. It was.

Q. Did you take the $700,000?

A. I sure did.

Q. Did he take half interest in Terrenates?

A. He sure did.

Q. Tell us how paper work was handled on the transfer of Terrenates to Mr. Villalobos.

A. We then contacted, or Mr. Villalobos contacted, a Mexican lawyer, Acosta Baylon, to have the records reflect our transaction. That, in Mexico—that takes quite some time.

[Tr. 344–346.]

\*   \*   \*   \*   \*   \*

Q. Now, would you tell the Court when your 300 shares of stock in Sahuarita was actually physically delivered to Mr. Villalobos?

A. After he had—I had come to an agreement with him that he would not pursue any claim against me or the 700,-000 in Mexico.

Q. You didn't—

A. Then I gave him—after we had our verbal agreement, I—and I had physical possession of the money, I turned over my stock to him.

Q. You didn't have your agreement with Mr. Villalobos until after you had actually received the $700,000 on January 31, '61, did you?

A. When I knew I had all control of all the money. I don't recall the date that was.

Q. That was after January 31, '61, when you took two checks?

A. I had control of the money before that.

[Tr. 356–57.]

\*   \*   \*   \*   \*   \*

Have you told, Mr. MacGuire, all that you want to tell about these negotiations with Mr. Villalobos?

THE WITNESS: I think it's come out before that, of course, when two people are trading and one is trading on Mexican property in Mexico, and one is an American citizen who is going to appear in a Mexican court, my mind told me that there is no way I could prevail in such a situation as that. I had to have this to get anything except the money—have anything left except the money

which I had physically in my hand. I had to stay out of a Mexican court.

BY MR. BRADBURY:

Q. Is that all in answer to my question now?

A. Yes. This was all done outside of courtroom in Mexico.

Q. What did you receive from Mr. Villalobos in return for the interest that you and your wife transferred to him in Terrenates?

A. The 700,000.

Q. Did you get the 700,000 from him?

A. In my mind when I received—not what you might make out of it—I received 700,000 and the guarantee I would not be sued on this Sahuarita proposition in Mexico or it would be brought up for another settlement.

Q. Did you receive the 700,000 from Terrenates or from Mr. Villalobos?

A. I think the record shows I took it out of a bank in the name of Terrenates.

Q. I initially had asked you what you received from Mr. Villalobos and I understood you to say $700,000.

THE COURT: *As I understand it, he gave up—Mr. Villalobos gave up whatever claim he might have had against the 700,000 and let Mr. MacGuire have it.* [Emphasis supplied.]

Q. What claim might Mr. Villalobos have in regard to Sahuarita?

A. In my mind he had a valid claim against the assets of Sahuarita, no matter how they were disguised and—let me state it another way. Mr. Villalobos made it very clear that he never had been paid for his investment in Sahuarita when Sahuarita's cattle were taken to Terrenates and ultimately sold over a period of years. Cows last—the useful life is 13 years. He wanted his share of that. Over the years his share had appeared that he and I were the only two remaining stockholders who were and could contest and claim the assets. This is bearer stock. I had to sell. I felt I had to see him before I determined to satisfy him. I took as much money as I physically could get my hands on that he could claim under any disguise of Terrenates, Sahuarita, or whatever it might be.

Q. Had you ever, before January 31, '61, ever received any money for your investment in Sahuarita?

A. No.

Q. You considered this $700,000 as Sahuarita money?

A. I sure did.

[Tr. 376–378.]

Betty MacGuire testified about the sale to Villalobis as follows:

Q. Mrs. MacGuire I hand you the minute book of Terrenates and the translation of the minutes of April 9, 1961 and ask if you executed a minute book on page 64.

A. That's my signature.

Q. And further would ask you, too, if this is your signature—

A. Yes, it is.

Q. —on the minutes of February 20, 1962?

A. Yes.

Q. In these transactions therein reflected, did you dispose of part of your interest in Terrenates?

A. Yes.

Q. To whom?

A. To Fernando Villalobos and Sarah Villalobos.

Q. The minutes of April, 1961 reflect a disposition of a portion of your interest in Terrenates, and the minutes of February, 1962 reflect the disposition of additional portion of your interest; is that correct?

A. Yes, sir.

Q. Do you remember why the two transactions occurred?

A. Yes.

Q. Would you tell us?

A. Well, the Villaloboses acquired a half of the company of Terrenates, but it was not allowed in Mexico that they be given just half. It had to be more

than 51 percent so that was the reason for the second transaction.

[Tr. 326–27.]

\* \* \* \* \* \*

Q. Mrs. MacGuire, one question. On cross examination you were asked whether you received anything for the transfer of half interest in Terrenates to Villaloboses. Let me ask you this: Ma'am, did you participate in the negotiations between Mr. MacGuire and Mr. Villalobos on this transfer?

A. Not other than signing the register and understanding what it was about, no.

Q. Did you have any knowledge of how much money, if any, Mr. MacGuire received as a result of this transfer?

A. I know about the 700,000.

Q. Was that the reason he got the 700,000?

A. Yes.

[Tr. 329–30.]

The testimony of the taxpayers was corroborated by that of Villalobis in pertinent part as follows:

Q. Would you tell us how that transfer came about?

A. At the beginning of '61, I discussed with Mr. MacGuire the fact that I was never paid for my portion of Sahuarita. The cattle that we had over there were the proceeds of the cattle and since Mr. Moor died, I believe this is '62—

Q. It is stipulated he died December 15, 1958.

A. At the end of '58, I told Mr. MacGuire that I thought, you know, I should be compensated for what I had in Sahuarita and all the years we operated.

Q. Yes, sir.

A. Mr. MacGuire told me that if I would be satisfied to increase my part in Terrenates for the part I owned in Sahuarita, which I accepted, and that's why this transaction was made.

Q. This has also been stipulated that Mr. MacGuire owed Terrenates exactly $700,000 at that time?

A. Uh huh.

Q. You drew out the $700,000?

A. Yes, sir.

Q. Was that a part of this transaction?

A. Yes. It was part of this transaction.

Q. He took $700,000 cash?

A. Uh huh.

Q. And you took a half interest?

A. I was given—giving up my right to the accumulated profits or proceeds of the cattle sold which amounted to $700,000 in exchange for a bigger share of Terrenates corporation.

Q. This was settlement of your rights in Sahuarita?

A. Yes, that's correct.

\* \* \* \* \* \*

Q. What other rights did you waive?

A. I lost the land I had bought and in my wife's name, and the one in my name.

Q. Yes sir.

A. And I rendered my services, my personal services, to the corporation for all those years, and I never received any compensation at all.

Q. Yes, sir.

A. So, considering all those things, that's why I accepted that settlement.

Q. Yes, sir, and in that settlement, did you, in return for your taking 50 percent interest in Terrenates, what did Mr. MacGuire get?

A. He got the $700,000 that were accumulating in the bank.

Q. Now, Mr. Villalobos, those minutes are dated April the 21st, 1961?

A. Yes.

Q. In that minute book—is that your signature at the bottom of that page?

A. Yes. It is my signature.

Q. And where were those prepared; do you remember?

A. These were prepared at the attorney's office.

Q. What was the attorney's name?

A. Saloman Acosta Baylon.

Q. And in your previous testimony you have described the ownership changes in the register of Terrenates, and there are no ownership changes in 1961 in the ownership registers. The only change is in February; do you remember that?

A. Yes, I remember that, and I remember the reason for that, I was supposed to get the permit from the Mexican State Department to make these changes to be legal. The attorney prepared the petition and I signed it and mailed it to Mexico City, and they did not approve it because the Mexican Government claim that she were asking that the foreigners didn't own more than 49 percent of the Mexican property.

Q. "Foreigners" would be Mr. and Mrs. MacGuire?

A. Yes, Americans or French or other nationality so that the reason for the delay, and then after that we have to make a new application. We hold another meeting.

Q. When was that meeting held?

A. It was held in February the 20th, 1962. I inform the partners that the permit was refused on those grounds, and I asked Mrs. MacGuire if she is willing to sell me a part of her share in order to increase the part of the Mexican citizens, my wife and I, above the 51 percent, so she accepted, and that's how I came to own 450,000 pesos of the capital, and my wife, 375,000 pesos, which make a 55 percent of the capital.

[Tr. 133–136.]

*    *    *    *    *    *

Q. Was one of your reasons you gave on direct examination for having received an increased interest in Terrenates in the stock that Mr. MacGuire had in Sahuarita that you had never received anything from Sahuarita, either for cattle or for your stock interest? Was that one of your reasons?

A. Yes, one of the reasons.

[Tr. 180.]

*    *    *    *    *    *

Q. Mr. MacGuire received $700,000 from a Terrenates bank account on January 31, 1961, and I understood you to say on direct examination that you were willing to let him have this because you are going to get certain things. Now, what value did you place on the fact that you had not received anything from Sahuarita in exchange for his getting this $700,000?

A. My personal services for so many years for one thing, and the loss of my two ranches.

Q. Loss of what?

A. Loss of two tracts of land I had that I leased to Mr. Moor, and he, in turn, leased to Sahuarita.

[Tr. 181.]

*    *    *    *    *    *

Q. In your swap of this $700,000 for your interest in Terrenates and the Sahuarita stock, what value did you place on your compensation that you didn't get over the years?

A. I told you before I considered the whole thing as one item.

Q. Now, do I understand your testimony on direct examination to be that you received 300 shares of stock in Sahuarita from Mr. MacGuire?

A. He turn over the stock to me.

[Tr. 183–84.]

*    *    *    *    *    *

Q. What was your deal with Mr. MacGuire then?

A. Well, he agreed to increase my part in Terrenates and I agreed that he would dispose of the money that was in the El Paso Bank.

Q. And that was the extent of your agreement?

A. In a few words, yes.

Q. When was that agreement reached? On what date?

A. On April 9, 1961.

Q. Mr. MacGuire had already withdrawn the $700,000 on January 31st, had he not? Do you know?

A. Well, maybe he did.

Q. All right. Now, when did you first learn—what year did you first learn that Terrenates had a bank account in El Paso at the State National Bank?

A. I knew all the time.

[Tr. 193–94.]

Villalobis further testified that the cattle and other property of Sahuarito were moved to Terrenates as an emergency measure and not as a sale when the Mexican soldiers occupied Sahuarito, and that thereafter when the cattle were sold from time to time, the proceeds were deposited in the name of Terrenates. This corroborates the testimony of taxpayer MacGuire.

The witness Saloman Acosta Baylon, a Mexican lawyer, testified that he drew up the papers for the transfer of 55 percent of taxpayers' interest in Terrenates to Mr. and Mrs. Villalobis and obtained the approval of the Mexican Government. This was corroborative of the testimony of the taxpayers and Villalobis. The minutes and papers showing the transaction were also introduced.

I have described the evidence in detail at the risk of being tedious, but I considered it necessary because it shows that the transaction occurred in the manner and for the purposes testified to by the taxpayers. This evidence refutes the theory that the taxpayer transferred 55 percent of Terrenates, which owned land worth $1,000,000 and cattle worth $500,000, plus all their interest in whatever property Sahuarito still had, except the $700,000, for nothing and without receiving any consideration whatever for the transfer.

The government offered no theory of taxation under which all of the $700,000 would be taxable as ordinary income, but relied on the presumption of correctness of the Commissioner's determination. The Tax Court upheld the position of the government and entered judgment against the taxpayers.

The taxpayers produced substantial evidence by their own testimony and by corroborating evidence that $420,000 of the $700,000 should be taxed as long term capital gain. Under these circumstances, the presumption of correctness of the Commissioner's determination disappeared to this extent and gave way to the substantial evidence of the taxpayers, and was no longer controlling. See E. Albrecht & Son v. Landy, 8 Cir., 1940, 114 F.2d 202, 206; Estate of Phillips v. Commissioner of Internal Revenue, 5 Cir. 1957, 246 F.2d 209; Gersten v. Commissioner of Internal Revenue, 9 Cir. 1959, 267 F.2d 195; and Mertens, Law of Federal Income Taxation, Vol. 9, § 50.64. In Commissioner of Internal Revenue v. Riss, 8 Cir. 1967, 374 F.2d 161, the court said:

> The presumption of correctness rule is usually dispositive of a case in situations where the taxpayer offers no substantial evidence to overcome the presumption created by the Commissioner's determination. However, when the taxpayer has offered substantial evidence to support his position, the presumption disappears. The fact issue must then be resolved by the Tax Court upon the basis of the evidence before it. If the taxpayer has demonstrated that the deficiency determination is erroneous, the taxpayer is not required to establish the correct amount of tax. * * * [*Id.* at 166.]

The Commissioner did not introduce evidence that the taxpayers received the $700,000, for any reason different from that shown by their testimony. The corroborated testimony of John and Betty MacGuire and Villalobis showed that the $700,000 came from the sale of Sahuarito cattle. There were only 750 shares of Sahuarito stock outstanding. The MacGuires owned 300 shares and Villalobis 450 shares. Accordingly, the MacGuires were entitled to $280,000 of the $700,000, which was ordinary income, and Villalobis was entitled to the remaining $420,000. However, the MacGuires sold Villalobis 55 percent of Terrenates and their 300 shares in Sahuarito and kept all of the $700,000. This meant that

they received $420,000 for these sales, which was long term capital gain.

The Tax Court rejected this testimony largely on what it termed as inconsistent unsworn statements given by MacGuire, Villalobis and MacGuire's accountant to revenue agents before the trial. Some of these inconsistencies were the following. For instance, the tax returns filed by the taxpayers for 1961 showed that they had sold 100 shares of Sahuarito for $700,000 when in fact he had sold 300 shares. The auditor of taxpayers explained that this was his mistake. The government made much of the fact that the returns did not say anything about the sale of a part interest in Terrenates. This was explained by the testimony of Mr. and Mrs. MacGuire and Villalobis to the effect that the $700,000 was derived from the sale of the Sahuarito cattle. Instead of dividing this money according to their respective interests ($280,000 to the MacGuires and $420,000 to Villalobis), the MacGuires sold Villalobis 55 percent of Terrenates and the 300 shares in Sahuarito for the interest of Villalobis in the $700,000, which was $420,000. The government also points to the fact that the agreement of settlement and sale was made verbally in January 1961, but the papers were not drawn up until the following April and not finally approved by Mexico until 1962. This has been fully explained by taxpayers and other witnesses, as shown above. It is well known that transactions of this kind are not usually effected in a hurry in Mexico. There were other minor inconsistencies in the evidence, such as whether Villalobis had sold the 300 shares of Sahuarito he got from Mac-Guire (Villalobis denied this at the trial, and it was immaterial, anyway); how many cattle were moved from Sahuarito to Terrenates; how many cattle were on Terrenates when the Sahuarito cattle were moved there; how many cattle were on Terrenates in 1961 when Taxpayer and Villalobis made their settlement; the value of Terrenates at the time the settlement was made; and various entries on the books of Sahuarito and Terrenates.

No doubt some of these variations in the evidence were troublesome to the court, but when considered singly or altogether, they do not disprove nor refute the basic contentions of the taxpayers.

In my opinion, the evidence fully supported the position of the taxpayers to the extent of $420,000 and constituted substantial evidence which overcame the presumption of correctness of the determination of the Commissioner to that extent. Under such circumstances, the presumption disappeared and the Commissioner had the burden of proving the existence and the amount of the deficiency. Cohen v. Commissioner of Internal Revenue, 9 Cir. 1959, 266 F.2d 5; Harp v. Commissioner of Internal Revenue, 6 Cir. 1959, 263 F.2d 139; Weir v. Commissioner of Internal Revenue, 6 Cir. 1960, 283 F.2d 675; Miller v. United States, 7 Cir. 1961, 296 F.2d 457; and Welch v. Commissioner of Internal Revenue, 4 Cir. 1961, 297 F.2d 309. He failed and refused to make such proof. Instead he chose to rely on the presumption of correctness of the Commissioner's determination. This was insufficient to meet the proof offered by the taxpayers. J. H. Robinson Truck Lines, Inc. v. Commissioner of Internal Revenue, 5 Cir. 1950, 183 F.2d 739 and R. P. Farnsworth & Co. v. Commissioner of Internal Revenue, 5 Cir. 1953, 203 F.2d 490. With the case in this posture, the court was required to decide the case on the preponderance of all the credible evidence introduced at the trial, with its final decision finding support in such evidence. Union Stock Farms v. Commissioner of Internal Revenue, 9 Cir. 1959, 265 F.2d 712, and Clark v. Commissioner of Internal Revenue, 9 Cir. 1959, 266 F.2d 698. Had the court followed this procedure, it would necessarily have found and decided that $420,000 of the $700,000 should have been taxed as long term capital gain and that the determination of the Commissioner that it should be taxed as ordinary income was arbitrary and unreasonable. Helvering v. Taylor, 293 U.S. 507, 55 S. Ct. 287, 79 L.Ed. 623 (1935).

The Tax Court rejected not only the testimony of the taxpayers, but also that of the disinterested witnesses who corroborated the taxpayers, as well as all other corroborative evidence. There was no substantial evidence supporting the Commissioner's determination. I think the court went too far in favoring the government. I am not unmindful of the rule that the court is the judge of the credibility of the witnesses and the weight to be given their testimony. But there is a limit to how far the court can go. The case is similar in this regard to J. H. Robinson Truck Lines, Inc. v. Commissioner of Internal Revenue, *supra,* where this court, speaking through Chief Judge Hutcheson, said:

The Commissioner offered no evidence.

The Tax court rejécted all of the evidence of all of the witnesses, and upon a record containing no evidence whatever supporting them, sustained the Commissioner's determinations * *.

Upon settled principles, it cannot do this, and in doing so, it erred. * * * [Cases omitted.] [*Id.* 183 F.2d at 740.]

The decision of the Tax Court, which is approved by the majority, necessarily takes the position that the taxpayer did not sell anything to Villalobis. This is not in accord with the facts. The evidence shows without contradiction that MacGuire and wife owned 98 percent of Terrenates, and that Terrenates owned 98,693 acres of land and other property. Villalobis owned the other 2 percent. The land alone was valued by Villalobis at $801,000 and valued at $1,000,000 by MacGuire. In addition, the cattle and other properties owned by Terrenates were valued by Villalobis at $438,664.74 and were valued at $500,000 by MacGuire. Even if these values were inflated, one fact stands out above all others, and that was the fact that MacGuire sold 55 percent of Terrenates, plus his 300 shares in Sahuarito to Villalobis for Villalobis' share in the $700,000, which amounted to $420,000. The 55 percent interest in the land alone was worth more than this consideration, to say nothing of the value of the cattle and other properties of Terrenates. There can be no doubt that this sale was made. MacGuire and wife and Villalobis so testified. In addition, the Mexican lawyer, Baylon, testified that he drew up the papers and got them approved by the Mexican Government. If the government had any proof the sale did not take place, it should have come forward with the evidence. This it did not do. The Tax Court entered judgment against the taxpayers as if the sale was not made and thus denied them the long term capital gain to which they were entitled. This is not only contrary to the uncontradicted evidence, but also is manifestly unfair and unjust. I cannot agree to a decision of this kind.

I would hold that under the authority of Rule 52(a) of the Federal Rules of Civil Procedure and Section 7482(a) of the Internal Revenue Code (26 U.S.C. § 7482(a)), the decision of the Tax Court was clearly erroneous and unwarranted to the extent of $420,000, as this amount should be taxed as long term capital gain. The decision of the Tax Court that the balance of the $700,000 in the sum of $280,000 should be taxed as ordinary income is correct.

I would affirm that portion of the judgment of the Tax Court that holds that the taxpayer is liable for ordinary income taxes on $280,000, but would reverse the judgment that the taxpayer is liable for ordinary income taxes on the balance of $420,000, and would hold that such $420,000 should be taxed as long term capital gain.